## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LINER TIRE, INC., TIRE TATTOO, INC.,
BARRY LINER, and MICHAEL LINER,

Plaintiffs,

-against-

Civil Action No.:  16-12468

ARCH CAPITAL FUNDING, LLC; CAP
CALL, LLC; EVEREST BUSINESS
FUNDING, LLC;  FUNDING METRICS, LLC,
d.b.a.QUICK FIX CAPITAL; HENRY
GUTTMAN; KARISH KAPITAL LLC;
MANTIS FUNDING, LLC; MCA RECOVERY,
LLC; MERCHANT DISCOUNT DIRECT,
LLC; NEW ERA LENDING, LLC; PEARL
BETA FUNDING, LLC; POWER UP
LENDING GROUP, LLC; RAM CAPITAL
GROUP, LLC; RAPID CAPITAL FINANCE,
LLC; RICHMOND CAPITAL GROUP, LLC;
SMART BUSINESS FUNDING, LLC; WIDE
MERCHANT INVESTMENT, INC.; AND
YELLOWSTONE CAPITAL, LLC,

Defendants.

## COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs Liner Tire, Inc., Tire Tattoo, Inc., Barry Liner, and Michael Liner (collectively "Liner Tire"), by their attorneys, White and Williams LLP, as and for their complaint and demand for a trial by jury, allege:

## NATURE OF THE ACTION

1.     This is an action to save a small, family-owned, one-hundred year old local business and its owner from financial ruin.

2.      Liner Tire, which has been servicing the New England area for more than 108 years, has been victimized by a group of predatory lenders that operate primarily out of New York (and appear not to be licensed to transact business in Massachusetts).

3.      In total, Defendants took over $1.5 million from Liner Tire, based on their predatory loans, which forced Liner Tire's owner, Barry Liner, to drain his life savings and forced his son, Michael Liner, to move back in with his parents at the age of 33.  It also caused Liner Tire to lose one of its long-time employees who it could no longer afford to pay.

4.      Lire Tire was caught in a common tactic used by these predatory lenders, which begins with a criminally usurious starter loan and ends in financial catastrophe.

5.      After inducing the victim to enter into one of these starter loans, a predatory lender will then actively solicit new loans from other lenders to ensure that the victim has sufficient short-term assets to pay off the first criminally usurious loan.  The victim then gets caught in an unsustainable spiral that snowballs until it hits the inevitable wall, draining not only the assets of the business but also the *personal* assets of these small business owners because they are required to personally guarantee the loans.  They then use these personal threats of financial disaster to exact even more blood from their victims.  That is exactly what happened here. Unfortunately, because Liner Tire's owner had significant personal assets, this process dragged on much longer than most.

6.      In an effort to disguise the criminally usurious nature of these loans, Defendants use a common instrument that purports on its face to be a "factoring agreement."  These, agreements (which are non-negotiated contracts of adhesion), however, lack all of the elements of a true "factoring agreement" and are nothing more than a disguised collateralized loan.

7.      Plaintiffs seek to declare the common instrument used by Defendants for what it is—a criminally usurious loan.

8.      Indeed, through the investigation of this claim, a "smoking gun" document has been located admitting to the true nature of these transactions.

9.       In entering into a nearly identical transaction, one of the Defendants actually called the transaction exactly what it was:

Congratulations! You have been approved for a PowerUp Business Loan. Please carefully review the loan details and simple next steps below.

Loan Details: Loan Amount: $170,000.00*   Total Payback Amount: $234,600.00

Term: __8__ months   Number of Payments: __168__   Daily Payment: $1,396.43   Origination Fee: $3,395.00

Additional Documentation and Details: *Less origination fee and payoffs to IOU,Pearl,Mantis,Ricmond, Yellowstone, Everest,Quickfix;Smart Business

10.     Owing to the rapid repayment rate on a daily basis, the effective interest rate on this admitted loan is, at least, 166%.

11.     Every other loan transaction provided by Defendants functions exactly the same way, although most were titled differently to disguise their true nature.

12.     Under both Massachusetts and New York law, courts look to the true nature of the transaction and not the name chosen by the parties.  Here, Liner Tire was in need of a short-term business loan, and Defendants gave it a short-term business loan—at a criminally usurious rate.

13.     When a court deems a loan to be usurious, it must declare the loan and its supporting documents void, enjoining enforcement of them and order that all documents and collateral be cancelled and surrendered.  Accordingly, the Plaintiffs are entitled to a declaratory judgment that the loans are void *ab initio* as criminally usurious and, therefore, Defendants are precluded from recovering any remaining installments due under the loans and must repay all payments made to date and that all documents and collateral be cancelled and surrendered.

3

## THE PARTIES

14.     Plaintiff Liner Tire, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal office located at 128 Boylston Street, Brookline, Massachusetts 02445.

15.     Plaintiff Tire Tattoo, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal office located at 128 Boylston Street, Brookline, Massachusetts 02445.

16.     Plaintiff Barry Liner resides at 145 Bridle Trail Road, Needham, Massachusetts 02492.

17.     Plaintiff Michael Liner resides at 145 Bridle Trail Road, Needham, Massachusetts 02492.

18.     Defendant Henry Guttman is an individual who resides in the State of California.

19.     Defendant Arch Capital Funding, LLC is a limited liability company duly organized under the laws of the State of New York with its principal place of business located at 160 Pearl Street, 5th Floor, New York, NY 10005.  On information and belief, Defendant Henry Guttman is or was the primary owner and/or investor in Arch Capital Funding.

20.     Defendant Cap Call, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 122 East 42nd St., STE 2112, New York, NY 10168.

21.     Defendant Everest Business Funding, LLC ("EBF Partners") is a limited liability company duly organized and existing under the laws of the State of Florida with its principal offices located at 2001 NW 107th Ave, 3rd Floor, Miami, Florida 33176.

4

22.     Defendant Funding Metrix, LLC is a limited liability company duly organized and existing under the laws of the Commonwealth of Pennsylvania with its principal offices located at 884 Town Center Drive, Langhorne, PA 19047.

23.     Defendant Mantis Funding, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 64 Beaver Street, STE 344, New York, NY 10004.

24.     Defendant MCA Recovery, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 17 State St., STE 4000, New York, NY 10004.

25.     Defendant New Era Lending, LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal offices located at North Orange Street, Suite 762, Wilmington, DE 19801.

26.     Defendant Pearl Beta Funding, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 40 Exchange Place, 3rd Floor, New York, NY 10005.

27.     Defendant Power Up Lending, LLC is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal offices located at 111 Great Neck Road, STE 216, Great Neck, NY 11021.

28.     Defendant Ram Capital Group, LLC is a limited liability company duly organized and existing under the laws of the State of New Jersey with its principal offices located at 1006 Monmouth Ave, Lakewood, NJ 08701.

29.     Defendant Richmond Capital Group, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 125 Maiden Lane, STE 501, New York, NY 10038.

30.     Defendant Smart Business Funding, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 2371 McDonald Ave, Brooklyn, NY 11223.

31.     Defendant Wide Merchant Investment, LLC is a corporation duly organized and existing under the laws of the State of New York with its principal offices located at 370 7th Ave, STE 1801, New York, NY 10001.

32.     Defendant Yellowstone Capital, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 160 Pearl Street, New York, NY 10005.

## JURISDICTION AND VENUE

33.     This Court has original jurisdiction over this action based upon 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

34.     This Court has jurisdiction over this declaratory judgment action under 28 U.S.C. § 2201 *et. seq.*

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the loans at issue were negotiated, executed, and performed in this judicial district.

36.     Venue is also proper because Defendants and Plaintiffs regularly conduct business within this judicial district.

37.     This Court has subject matter jurisdiction under Mass. Gen. L. ch. 271, § 49(c), which confers subject matter jurisdiction on Massachusetts courts to declare a criminally usurious loan transaction void.

**FACTUAL BACKGROUND**

38.     Liner Tire is engaged in the wholesale and retail sale of automotive tires to customers throughout the New England area.  It is a family business that has been serving the New England area for more than one-hundred years.

39.     Over the past several years, Liner Tire and the tire industry in general suffered a significant downturn in overall sales.  As a result, Liner Tire experienced a substantial cash shortfall to meet its financial obligations.

40.     In or around early 2014, Barry Liner contacted a broker to assist it with obtaining a short-term business loan to meet those cash flow needs.

41.     Primarily through this broker, Liner Tire entered into the series of loan transactions at issue in this action.

42.     In addition to entering into many of these loans through a broker, Barry Liner was also introduced to some of the other Defendants through references or as the result of an Internet search for providers of short-term business loans.

43.     In entering into these criminally usurious loans, Defendants conspired with each other to enter into the criminally usurious loans.

44.     Among other things, Defendants were aware of Liner Tire's other loans with Defendants through word-of-mouth within the industry.  Defendants were also aware of Liner Tire's other loans with Defendants as a result of the underwriting process.  Defendants were

further aware of the other loans with Defendants by monitoring Liner Tire's accounts under the agreements.  Defendants also exchanged Liner Tire's financial information among Defendants.

45.     Each of these criminally usurious loan transactions had the same or similar material terms and conditions.

46.     Although many of the agreements documenting the transaction asserts that the transaction involved the purchase by Defendants of Liner Tire's accounts receivable, each transaction, when viewed in its totality, is a collateralized loan transaction.

47.     At all relevant times, Liner Tire considered these transactions to be short-term business loans.  At no point, did Liner Tire ever seek to sell an interest in its accounts receivable because Liner Tire was concerned that there was a collection risk from any of its customers.  Nor did Defendants value the transactions based on the collectability risk of Liner Tire's customers or their ability to pay.  Rather, the form of the transactions was dictated solely by Defendants with the intent to disguise the true nature of the transaction.

48.     Defendants entered into these transactions with the intent to charge an interest rate in excess of 25% on a loan transaction.

49.     The following documents or similar documents were required to be executed:

a)      Merchant Agreement or similar purported factoring agreement;

b)      Security Agreement and Guaranty;

c)      ACH Authorization Form; and

d)      Affidavit of Confession of Judgment.

50.     Liner Tire, Tire Tattoo and Barry Liner were not represented by counsel in connection with any of these transactions.

51.     Under the agreements, no accounts which were purportedly the subject of the sale were listed.  Nor did Defendants ever contact any of Liner Tire's customers to investigate or assess their ability to pay.  There was also no effective transfer of ownership of the accounts receivables to Defendants as a consequence of the sale, and the right of Defendants to collect the receivables only arose if there was a default by Liner Tire in making payments of the daily installments.  Further, there was no provision in the agreements for notification of the account debtors of any assignment of the receivables, and once the daily installments were paid to Defendants, ownership of the receivables remained with Liner Tire.

52.     Nor did Liner Tire understand that there was any risk transfer contemplated under the agreements.  The underwriting of these loans was also not based on any risk assessment of any particular account receivable.

53.     Liner Tire understood at all times that payment of the daily specified amounts was an unconditional requirement of the loan agreements regardless of whether Liner Tire had recovered receivables sufficient to cover that amount.  Moreover, Defendants did not actively attempt to collect on any of these alleged receivables directly from Liner Tire's customers. Instead, they simply took the loan repayment amounts directly from Liner Tire's business accounts without regard to how those amounts were generated.  In fact, in order to repay Defendants through daily specified amounts, Liner Tire was required to go out and obtain additional loans that had nothing to do with customer receivables.  These loan funds were taken by Defendants knowing that they were not tied to any customer receivables.

54.     The provision in some of Defendants' agreements purporting to allow for a reconciliation based on the actual accounts receivables was unilaterally placed in the agreements solely for the purpose of avoiding the criminal usury laws and was never intended by any party

to actually be enforced.  In more than two-and-a-half years, not a single Defendant has ever reconciled its daily specified payments or refunded a repayment based on this purported reconciliation provision.  Nor has any Defendant ever asked to perform an accounting under that provision to determine the actual customer receivables.  Moreover, Liner Tire was never apprised of this provision, which is in small writing to conceal it from Liner Tire.

55.    Defendants unilaterally inserted this provision without Liner Tire's knowledge and it was a term that was never negotiated.

56.    Each of the Defendants knew that they were charging a criminally usurious interest rate because the anticipated term of the loan was based on the number of daily specified payments at the time of each transaction.

57.    Plaintiff Barry Liner also understood that these were full recourse loans in which he would be personally responsible to pay in the event that Liner Tire could not pay the daily specified amounts of the loans based on the actual receivables obtained by Liner Tire.

**THE LOAN AGREEMENTS**

58.    The number and amount of these criminally usurious loans, and the eagerness and number of these lenders available in the marketplace today—is jaw dropping.

59.    The first criminally usurious loan at issue was entered into with Arch Capital on March 25, 2014.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Arch Capital loaned Liner Tire the sum of $50,000 payable in 60 equal installments of $1,199 resulting in an aggregate payment of $72,500.  In addition to charging Liner Tire $22,500 in interest over a three-month period, an effective interest rate of at least 2,084%, Liner Tire paid Arch Capital additional fees.  These fees

constituted fees charged by Arch Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 2,084%.

60.     On March 26, 2014, Liner Tire entered into a criminally usurious loan transaction with Cap Call.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Cap Call loaned Liner Tire the sum of $75,000 payable in 109 equal installments of $995 resulting in an aggregate payment of $108,675.  In addition to charging Liner Tire $33,675 in interest over an approximate six-month period, an effective interest rate of at least 517%, Liner Tire paid Cap Call an additional "Professional Services Fee."  The Professional Services Fee constituted a fee charged by Cap Call in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 517%.

61.     On July 17, 2014, Liner Tire entered into a criminally usurious loan with EBF Partners.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."  In reality, EBF Partners loaned Liner Tire the sum of $50,000 to be repaid in 89 equal installments of $789.77 resulting in an aggregate payment of $69,500.  In addition to charging Liner Tire $19,500 in interest over an approximate five-month period, an effective interest rate of at least 491%, Liner Tire paid EBF Partners additional fees.  These fees constituted a fee charged by EBF Partners in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 491%.

62.     On September 28, 2014, Liner Tire entered into a criminally usurious loan with Pearl Capital.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Pearl Capital loaned Liner Tire the sum

11

of $28,000 to be repaid in 70 equal installments of $580 resulting in an aggregate payment of $40,600.  In addition to charging Liner Tire $12,600 in interest over an approximate five-month period, an effective interest rate of at least 1434%, Liner Tire paid Pearl Capital $800 in additional fees.  These fees constituted fees charged by Pearl Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 1434%.

63.     On September 29, 2014, Liner Tire entered into a criminally usurious loan with EBF Partners.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."  In reality, EBF Partners loaned Liner Tire the sum of $55,000 to be repaid in 100 equal installments of $764.50 resulting in an aggregate payment of $76,450.  In addition to charging Liner Tire $21,450 in interest over a five-month period, an effective interest rate of at least 458%, Liner Tire paid EBF Partners additional fees.   These fees constituted a fee charged by EBF Partners in consideration for making the loan and constituted additional interest, making the effective interest rate of the loan exceed 458%.

64.     On October 1, 2014, Liner Tire entered into a criminally usurious loan with Arch Capital.  The loan was similarly disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Arch Capital loaned Liner Tire the sum of $50,000 payable in 71 equal installments of $999 resulting in an aggregate payment of $71,000.  In addition to charging Liner Tire $21,000 in interest over an approximate four-month period, an effective interest rate of at least 1068%, Liner Tire paid Arch Capital additional fees. These fees constituted fees charged by Arch Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the loan exceed 1068%.

65.     On November 5, 2014, Liner Tire entered into a criminally usurious loan with EBF Partners.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."   In reality, EBF Partners loaned Liner Tire the sum of $50,000 to be repaid through 30% of Liner Tire's receivables resulting in an aggregate payment of $70,000.   In addition to charging Liner Tire $20,000 in interest over an expected period six-months or less, an effective interest rate of at least 50%, Liner Tire paid EBF Partners an additional "Origination Fee." This addition fee constituted a fee charged by EBF Partners in consideration for making the loan and constituted additional interest, making the effective interest rate of the loan exceed 50%.

66.     On December 9, 2014, Liner Tire entered into a criminally usurious loan with Pearl Capital.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Pearl Capital loaned Liner Tire the sum of $60,000 to be repaid in 70 equal installments of $1,243 resulting in an aggregate payment of $87,000.   In addition to charging Liner Tire $27,000 in interest over an approximate five-month period, an effective interest rate of at least 1,435%, Liner Tire paid Pearl Capital $800 in additional fees.   These fees constituted fees charged in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 1,435%.

67.     On January 22, 2015, Liner Tire entered into a criminally usurious loan with EBF Partners.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."   In reality, EBF Partners loaned Liner Tire the sum of $60,000 to be repaid in 84 equal installments of $1,000 resulting in an aggregate payment of $84,000.   In addition to charging Liner Tire over $24,000 in interest over an approximate four-month period, an effective interest rate of at least 731%, Liner Tire paid EBF

Partners additional fees.  These fees constituted a fee charged by EBF Partners in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 731%.

68.     On February 17, 2015, Liner Tire entered into a criminally usurious loan with Pearl Capital.  The loan was similarly disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Pearl Capital loaned Liner Tire the sum of $75,000 to be repaid in 88 equal installments of $1,236 resulting in an aggregate payment of $108,750.  In addition to charging Liner Tire $33,750 in interest over an approximate five-month period, an effective interest rate of at least 898%, Liner Tire paid Pearl Capital $800 in additional fees.  These fees constituted fees charged by Pearl Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 898%.

69.     On March 4, 2015, Liner Tire also entered into a criminally usurious loan with Mantis Funding.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Mantis Funding loaned Liner Tire the sum of $35,700 to be repaid in 88 equal installments of $588 resulting in an aggregate payment of $51,765.  In addition to charging Liner Tire over $15,000 in interest over an approximate four-month period, an effective interest rate of at least 360%, Liner Tire paid Mantis Funding additional fees.  These fees constituted a fee charged by Mantis Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 360%.

70.     On March 4, 2015, Liner Tire also entered into a criminally usurious loan with Smart Capital.  The loan was disguised in the form of a purchase of Liner Tire's accounts

receivables under a "Merchant Agreement."  In reality, Smart Capital loaned Liner Tire the sum of $50,000 to be repaid through 20% of Liner Tire's receivables in an aggregate payment of $72,995.  In addition to charging Liner Tire $22,995 in interest over less than an anticipated six-month period, an effective interest rate of at least 400%, Liner Tire paid Smart Capital nearly $4,000 in additional fees.  These fees constituted fees charged by Yellowstone in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 400%.

71.    On March 30, 2015, Liner Tire entered into a criminally usurious loan with Richmond Capital.  This loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Richmond Capital loaned Liner Tire the sum of $50,000 to be repaid in 71 equal installments of $1,055 resulting in an aggregate payment of $74,950.  In addition to charging Liner Tire in $24,950 in interest over an approximate six-month period, an effective interest rate of at least 1,673%, Liner Tire paid Richmond Capital an additional "ACH Program Fee."  The Program Fee constituted a fee charged by Richmond Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 1,673%.

72.    On April 14, 2015, Liner Tire entered into a criminally usurious loan with Yellowstone.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Yellowstone loaned Liner Tire the sum of $50,000 to be repaid through 15% of Liner Tire's receivables in an aggregate payment of $72,500.  In addition to charging Liner Tire $22,500 in interest over less than an anticipated six-month period, an effective interest rate of at least 400%, Liner Tire paid Yellowstone $695 in additional fees.  These fees constituted fees charged in consideration for

15

making the loan and constituted additional interest, making the effective interest rate of the loan exceed 400%.

73.     On April 22, 2015, Liner Tire entered into a criminally usurious loan with EBF Partners.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."  In reality, EBF Partners loaned Liner Tire the sum of $70,000 to be repaid in 90 equal installments of $1,120 resulting in an aggregate payment of $100,800.  In addition to charging Liner Tire over $30,000 in interest over an approximate four-month period, an effective interest rate of at least 731%, Liner Tire paid EBF Partners additional fees.  These fees constituted a fee charged by EBF Partners in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 731%.

74.     On April 22, 2015, Liner Tire also entered into a criminally usurious loan with Mantis Funding.   Again, the loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Mantis Funding loaned Liner Tire the sum of $40,000 to be repaid in 80 equal installments of $725 resulting in an aggregate payment of $58,000.  In addition to charging Liner Tire $18,000 in interest over an approximate four-month period, an effective interest rate of at least 1,016%, Liner Tire paid Mantis Funding additional fees.  These fees constituted a fee charged by Mantis Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 1,016%.

75.     On June 22, 2016, Liner Tire entered into a criminally usurious loan with Power Up.  This loan was actually called a loan agreement on its face, which possessed the same fundamental form of all of the other agreements in this action.  Like the other agreements, Power

Up loaned Liner Tire the sum of $170,000 to be repaid in 168 equal installments of $1,396.43 resulting in an aggregate payment of $234,600.  In addition to charging Liner Tire $64,600 in interest over an eight-month period, an effective interest rate of at least 166%, Liner Tire paid Power Up an additional "Origination Fee."  The Origination Fee constituted a fee charged by Power Up in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 166%.

76.    On June 30, 2015, Liner Tire entered into a criminally usurious loan with Arch Capital.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Arch Capital loaned Liner Tire the sum of $100,000 to be repaid through 30% of Liner Tire's credit card receivables resulting in an aggregate payment of $145,000.  In addition to charging Liner Tire over $45,000 in interest over an expected period six-months or less, an effective interest rate of at least 50%, Liner Tire paid Arch Capital an additional "Origination Fee" of $4,995.  The "Origination Fee" constituted a fee charged by Arch Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the loan exceed 50%.

77.    On August 10, 2015, Liner Tire entered into a criminally usurious loan with EBF Partners.  Again, the loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."  In reality, EBF Partners loaned Liner Tire the sum of $75,000 to be repaid in 90 equal installments of $1,200 resulting in an aggregate payment of $108,000.  In addition to charging Liner Tire over $33,000 in interest over an approximate five-month period, an effective interest rate of at least 731%, Liner Tire paid EBF Partners additional fees.  These fees constituted a fee charged by EBF Partners in

consideration for making the loan and constituted additional interest, making the effective interest rate of the loan exceed 731%.

78.     On September 28, 2015, Liner Tire entered into a criminally usurious loan with Wide Merchant Investment.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."   In reality, Wide Merchant Investment loaned Liner Tire the sum of $12,000 to be repaid in 90 equal installments of $180 resulting in an aggregate payment of $16,200.  In addition to charging Liner Tire $4,000 in interest over an approximate four-month period, an effective interest rate of 460%, Liner Tire paid Wide Merchant Investment an additional "Origination Fee."   The Origination Fee constituted a fee charged in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 460%.

79.     On November 25, 2015, Liner Tire entered into a criminally usurious loan with Richmond Capital.  This loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Richmond Capital loaned Liner Tire the sum of $150,000 to be repaid in 105 equal installments of $2,071.42 resulting in an aggregate payment of $217,500.   In addition to charging Liner Tire in 67,500 in interest over an approximate six-month period, an effective interest rate of at least 546%, Liner Tire paid Richmond Capital an additional "ACH Program Fee" of $1,999.  The Program Fee constituted a fee charged by Richmond Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 546%.

80.     On January 5, 2016, Liner Tire entered into a criminally usurious loan with Merchant Discount Direct.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Merchant Discount loaned

Liner Tire the sum of $50,000 to be repaid in 88 equal installments of $795.45 resulting in an aggregate payment of $70,000.   In addition to charging Liner Tire $20,000 in interest over an approximate five-month period, an effective interest rate of at least 520%, Liner Tire paid Merchant Discount additional fees.   These fees constituted a fee charged by Merchant Discount in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 520%.

81.    On January 5, 2016, Liner Tire also entered into a criminally usurious loan with Discount Merchant Funding.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Revenue Based Factoring Agreement."   In reality, Discount Merchant Funding loaned Liner Tire the sum of $260,000 to be repaid in 252 equal installments of $1,424 resulting in an aggregate payment of $358,800.   In addition to charging Liner Tire almost $100,000 in interest over an approximate one-year period, an effective interest rate of at least 97%, Liner Tire paid Discount Merchant Funding an additional "Origination Fee."   The Origination Fee constituted a fee charged by Discount Merchant Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 97%.

82.    On February 10, 2016, Liner Tire entered into a criminally usurious loan with Discount Merchant Funding.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Revenue Based Factoring Agreement."   In reality, Discount Merchant Funding loaned Liner Tire the sum of $40,000 to be repaid in 35 equal installments of $1,568 resulting in an aggregate payment of $55,200.   In addition to charging Liner Tire over $15,000 in interest over an approximate two-month period, an effective interest rate of at least 718%, Liner Tire paid Discount Merchant Funding an additional "Origination Fee."   The

Origination Fee constituted a fee charged by Discount Merchant Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 718%.

83.     On February 16, 2016, Liner Tire entered into a criminally usurious loan with Rapid Capital Finance.  The loan made was similarly disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Rapid Capital Finance loaned Liner Tire the sum of $60,000 to be repaid in 168 equal installments of $500 resulting in an aggregate payment of $84,000.  In addition to charging Liner Tire $24,000 in interest over an approximate eight-month period, an effective interest rate of at least 180%, Liner Tire paid Rapid Capital Finance other service fees.  These other fees constituted fees charged by Rapid Capital Finance in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 180%.

84.     On March 8, 2016, Liner Tire entered into a criminally usurious loan with ACE Funding.  This loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, ACE Funding loaned Liner Tire the sum of $100,000 to be repaid in 126 equal installments of $1,158 resulting in an aggregate payment of $145,900. In addition to charging Liner Tire almost $46,000 in interest over an approximate six-month period, an effective interest rate of at least 383%, Liner Tire paid ACE Funding an additional "Professional Services Fee."  The Professional Services Fee constituted a fee charged by ACE Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 383%.

85.     On March 23, 2016, Liner Tire entered into a criminally usurious loan with Funding Metrix.  The loan was disguised in the form of a purchase of Liner Tire's accounts

receivables under a "Purchase and Sale of Future Receivables."  In reality, Funding Metrix loaned Liner Tire the sum of $50,000 to be repaid in 99 equal installments of $732 resulting in an aggregate payment of $72,500.  In addition to charging Liner Tire $22,500 in interest over an approximate five-month period, an effective interest rate of at least 646%, Liner Tire paid Funding Metrix an additional "Origination Fee."  The Origination Fee constituted a fee charged by Funding Metrix in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 646%.

86.     On March 31, 2016, Liner Tire entered into a criminally usurious loan with Power Up.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement."  In reality, Power Up loaned Liner Tire the sum of $175,000 to be repaid in 210 equal installments of $1,125 resulting in an aggregate payment of $236,250.  In addition to charging Liner Tire $61,250 in interest over an approximate ten-month period, an effective interest rate of at least 115%, Liner Tire paid Power Up an additional "Origination Fee."  The Origination Fee constituted a fee charged in consideration for making the loan and constituted additional interest, making the effective interest rate of the loan exceed 115%.

87.     On April 20, 2016, Liner Tire entered into a criminally usurious loan with Richmond Capital.  The loan was also disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Richmond Capital loaned Liner Tire the sum of $125,000 to be repaid in 100 equal installments of $1,873.75 resulting in an aggregate payment of $187,375.  In addition to charging Liner Tire $62,375 in interest over an approximate five-month period, an effective interest rate of at least 751%, Liner Tire paid Richmond Capital an additional "ACH Program Fee" of $1,999.  The Program Fee constituted a

fee charged by Richmond Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 751%.

88.     On May 12, 2016, Liner Tire entered into a criminally usurious loan with Funding Metrix.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Funding Metrix loaned Liner Tire the sum of $54,750 to be repaid in 132 equal installments of $580.68 resulting in an aggregate payment of $76,650.  In addition to charging Liner Tire $22,000 in interest over an approximate seven-month period, an effective interest rate of at least 269%, Liner Tire paid Funding Metrix an additional "Origination Fee."  The Origination Fee constituted a fee charged by Funding Metrix in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 269%.

89.     On July 29, 2016, Liner Tire entered into a criminally usurious loan with Richmond Capital.  This loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Richmond Capital loaned Liner Tire the sum of $150,000 to be repaid in 120 equal installments of $1,873.75 resulting in an aggregate payment of $224,850.  In addition to charging Liner Tire almost $75,000 in interest over an approximate six-month period, an effective interest rate of at least 505%, Liner Tire paid Richmond Capital an additional "ACH Program Fee" of $1,999.  The Program Fee constituted a fee charged by Richmond Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 505%.

90.     On August 22, 2016, Liner Tire entered into a criminally usurious loan with ACE Funding.  This loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, ACE Funding loaned Liner Tire the sum of $75,000

to be repaid in 80 equal installments of $1,358 resulting in an aggregate payment of $109,425. In addition to charging Liner Tire almost $35,000 in interest over an approximate four-month period, an effective interest rate of at least 1008%, Liner Tire paid ACE Funding an additional "Professional Services Fee." The Professional Services Fee constituted a fee charged by ACE Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 149%.

91.     On August 25, 2016, Liner Tire entered into two similar criminally usurious loans with Power Up. The first loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement." In reality, Power Up loaned Liner Tire the sum of $150,000 to be repaid in 105 equal installments of $1,928.57 resulting in an aggregate payment of $202,500. In addition to charging Liner Tire more than $52,000 in interest over an approximate five-month period, an effective interest rate of at least 343%, Liner Tire paid Power Up an additional "Origination Fee" of $3,000. The Origination Fee constituted a fee charged by Power Up in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 343%. This loan consolidated prior loans by Defendants Mantis, Quickfix, Yellowstone and Richmond.

92.     The second loan made by Power Up on August 25, 2016 was likewise disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement." In reality, Power Up loaned Liner Tire the sum of $125,000 to be repaid in 168 equal installments of $930.06 resulting in an aggregate payment of $156,250. Power Up charged Liner Tire more than $30,000 in interest over an approximate eight-month period, an effective interest rate of 91%.

93.     On August 31, 2016, Liner Tire entered into a criminally usurious loan with Ram Capital.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Ram Capital loaned Liner Tire the sum of $150,000 to be repaid in 100 equal installments of $2,249 resulting in an aggregate payment of $224,850.  In addition to charging Liner Tire almost $75,000 in interest over an approximate five-month period, an effective interest rate of at least 754%, Liner Tire paid Ram Capital an additional "ACH Program Fee" of $1,999.  The Program Fee constituted a fee charged by Ram Capital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 754%.

94.     On September 8, 2016, Liner Tire entered into a criminally usurious loan transaction with Yellowstone.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Yellowstone loaned Liner Tire the sum of $65,000 to be repaid in 90 equal installments of $1,054 resulting in an aggregate payment of $94,835.  In addition to charging Liner Tire almost $30,000 in interest over less than an approximate five-month period, an effective interest rate of at least 802%, Liner Tire paid Yellowstone an additional "ACH Program Fee."  The Program Fee constituted a fee charged by Yellowstone in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 802%.

95.     On September 21, 2016, Liner Tire entered into a criminally usurious loan with Cap Call.  The loan made by Cap Call was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Cap Call loaned Liner Tire the sum of $100,000 to be repaid in 100 equal installments of $1,499 resulting in an aggregate payment of $149,900.  In addition to charging Liner Tire almost $50,000 in interest over an

24

approximate five-month period, an effective interest rate of at least 753%, Liner Tire paid Cap Call an additional "Professional Services Fee."  The Professional Services Fee constituted a fee charged by Cap Call in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 753%.

96.     On September 26, 2016, Liner Tire entered into a criminally usurious loan with Capacity Funding.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under an "Agreement for the Purchase and Sale of Future Receipts."  In reality, Capacity Funding loaned Liner Tire the sum of $176,000 to be repaid in 145 equal installments of $1,800 resulting in an aggregate payment of $260,000.  In addition to charging Liner Tire $84,000 in interest over less than an approximate three-month period, an effective interest rate of at least 331%, Liner Tire paid Capacity Funding additional Upfront Fees of $5,811.  These Upfront Fees constituted fees charged by Capacity Funding in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 331%.

97.     On September 27, 2016, Liner Tire entered into a criminally usurious loan transaction with New Era.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, New Era loaned Liner Tire the sum of $50,000 to be repaid in 60 equal installments of $1,208 resulting in an aggregate payment of $72,500.  In addition to charging Liner Tire more than $22,000 in interest over an approximate three-month period, an effective interest rate of at least 2219%, Liner Tire paid Cap Call an additional "Professional Services Fee."  The Professional Services Fee constituted a fee charged by Cap Call in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 2,219%.

98.    On September 27, 2016, Liner Tire entered into a criminally usurious loan transaction with Yellowstone.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Yellowstone loaned Liner Tire the sum of $75,000 to be repaid in 110 equal installments of $994.72 resulting in an aggregate payment of $109,425.  In addition to charging Liner Tire almost $46,000 in interest over an approximate five-month period, an effective interest rate of at least 514%, Liner Tire paid Yellowstone an additional "ACH Program Fee."  The Program Fee constituted a fee charged by Yellowstone in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 514%.

99.    On October 21, 2016, Liner Tire entered into a criminally usurious loan with Wide Merchant Investment.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Wide Merchant Investment loaned Liner Tire the sum of $15,000 to be repaid in 80 equal installments of $273.75 resulting in an aggregate payment of $21,900.  In addition to charging Liner Tire nearly $7,000 in interest over an approximate four-month period, an effective interest rate of at least 1070%, Liner Tire paid Wide Merchant Investment an additional "Origination Fee."  The Origination Fee constituted a fee charged in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 1,070%.

100.    On October 27, 2016, Liner Tire entered into its last criminally usurious loan with Karish Kapital.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Karish Kapital loaned Liner Tire the sum of $20,000 to be repaid in 70 equal installments of $420 resulting in an aggregate payment of $29,400.  In addition to charging Liner Tire over $9,000 in interest over an approximate four-

month period, an effective interest rate of at least 1608%, Liner Tire paid Karish Kapital an additional "Program Fee" of $675.  The Program Fee constituted a fee charged by Karish Kapital in consideration for making the loan and constituted additional interest, making the effective interest rate of the Loan exceed 1,608%.

101.    In total, Liner Tire was charged a staggering $1,471,145 in interest on the face of these loans (not including so-called fees), spanning about two-and-a-half years.

## ACE FUNDING

102.    In or around September 2016, the inevitable happened.  The specified daily amounts that Defendants electronically debited were rejected due to insufficient funds.  As a result, Plaintiffs requested that the daily payments be temporarily reduced until the cash receipts improved.

103.    Proving the true nature of these transactions, ACE Funding refused to reduce the specified daily amount, responding:  "Not happening, Barry.  Sorry."  Instead of adjusting the loan to reflect the actual receipts, ACE Funding attempted to debit more than the specified daily amount creating a negative balance in the Liner Tire accounts.

104.    Between March 2016 and October 2016, ACE Funding received almost $150,000 from Liner Tire on original loan proceeds of $142,000.  It then obtained a Judgment by Confession for an additional $100,008.35.

105.    Instead of working with Plaintiffs to restructure the repayment, ACE Funding filed and obtained a Judgment by Confession on October 28, 2016 (through MCA Recovery and its attorney Renata Bukhman), and then immediately instituted actions to seize the business assets of Liner Tire, which resulted in at least three accounts with Santander Bank being frozen.

106.    This resulted in further ACH debits by Defendants being rejected.

107.     Within days, if not hours of ACE Funding's freezing of Liner Tire's accounts, Defendants immediately contacted Plaintiffs, and many threatened to take legal and/or enforcement action under the agreements if Plaintiffs did not provide an alternative source of funding.

108.     At least one of the Defendants, Cap Call, did, in fact, act on its threats by seizing one of Liner Tire's credit card vendors, which not only caused personal and professional embarrassment, but also directly interfered with Liner Tire's ability to conduct its business and pay its other vendors and customers.

109.     In fact, when Plaintiffs asked Cap Call to release its freeze on Liner Tire's credit card vendor, Cap Call demanded that Liner Tire sign a settlement agreement and release before it would agree to release those assets.  As of the date of this filing, Cap Call continues to hold Liner Tire's credit card vendor hostage.

110.     One other Defendant, Richmond Capital, also threated to take legal action against Liner Tire, and Barry Liner, personally.

111.     Under the duress caused by ACE Funding's actions via MCA Recovery, Liner Tire agreed to settle its claims against ACE Funding for $20,000.  This settlement under duress did not release any claims against MCA Recovery.  Nor did Plaintiff Michael Liner release any of his claims against ACE Funding.

**MCA RECOVERY**

112.     MCA Recovery is a purported collection agency owned by Zachary Chasin.

113.     On information and belief, MCA Recovery is practicing law without a license.

114.    Among other things, MCA Recovery is used to draft, file and enforce the confessions of judgments used in connection with the criminally usurious loans of Yellowstone and ACE Funding.

115.    One of the investors and/or owners of Yellowstone is Zachary Chacin's younger brother, Alex Chacin.

116.    MCA Recovery has conspired with and assisted Yellowstone and ACE Funding with entering into the criminally usurious loans with Liner Tire.

117.    On information and belief, MCA Recovery has a team of lawyers who directly or indirectly profit from the criminally usurious loans that they conspire with or assist Yellowstone and ACE Funding with entering into and enforcing any defaults thereto.

118.    MCA Recovery, through its team of lawyers, attempted to seize and did in fact freeze the assets of Liner Tire's Santander Bank account located in Massachusetts on November 3, 2016.

119.    Liner Tire has been directly damaged as a result of MCA Recovery's unlawful actions in the Commonwealth of Massachusetts.

**YELLOWSTONE**

120.    Yellowstone's conduct is perhaps the most pervasive in the industry.

121.    According to one of its owners, Yellowstone makes $500 million in these types of loans—every month.  If true, Yellowstone issues $6 billion dollars a year in these types of loans.

122.    Yellowstone unfairly exerts its financial might to threaten and intimidate its financially weakened victims into capitulating to its unlawful demands.   In this case alone, Yellowstone brandished its financial superiority taunting Liner Tire, a local Boston company,

when it had the temerity to obtain the assistance of counsel:  "do you think you have the war chest to keep up with us in court?  Come on man"

123.    A search of the New York E-Court system reveals 29 actions brought by Yellowstone through its partner HCA Recovery, a collection organization that appears to be practicing law without a license.

124.    It appears that New Era Lending is equally aggressive with 24 actions itself.

125.    In comparison, the cumulative total of all other Defendants is 3.

### DAMAGES

126.    Due to Liner Tire's financial condition, Liner Tire has already had to reduce the pay of long-time employees who have threatened to leave, and did in fact, leave Liner Tire.

127.    Barry Liner has personally stopped taking a salary due to the financial condition of Liner Tire, and so has his son, Michael Liner.

128.    As a direct, proximate and foreseeable cause of Defendant's unlawful actions, Michael Liner has been forced to sell his residential home and pay Liner Tire's vendors out of his own pocket.  He is now forced to live with his parents at the age of 33.

129.    As a direct, proximate and foreseeable cause of Defendant's unlawful actions, Barry Liner has also had to borrow substantial sums from other family members in order keep Liner Tire afloat and to keep up with his own personal finances.

130.    As a direct, proximate and foreseeable cause of Defendant's unlawful actions, Barry Liner was also forced to liquidate his retirement funds and prematurely pay income taxes on amounts he was required to use to keep his third generation business afloat.

131.    As a direct, proximate and foreseeable cause of Defendant's unlawful actions, Barry Liner and Michael Liner have suffered mental anguish and severe emotional distress.

132.    As a result of Defendants criminal conduct, Barry Liner has also personally suffered damages by having to provide loans to Liner Tire from his personal and retirement assets.  Among other things, Mr. Liner has had to pay taxes, interest and penalties as a result of these personal loans.  Mr. Liner has also suffered losses on those loans because Liner Tire is currently unable to payback those loans.

133.    Liner Tire has also suffered direct damages by loss of goodwill, personnel and business opportunities.

**FIRST CAUSE OF ACTION**
(Declaratory Judgment/Criminal Usury)

134.    Plaintiffs repeat and re-alleges the allegations of each of the foregoing paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.    Plaintiffs have no adequate remedy at law.

136.    Each of the agreements entered into between Plaintiffs and Defendants sets forth a collateralized loan transaction to which Massachusetts and New York usury laws are applicable.

137.    Each of the loans charges a criminally usurious interest rate in excess of 25%.

138.    Plaintiffs and Defendants intended to enter into a loan transaction for each of the agreements at issue.

139.    Defendants knowingly charged a criminally usurious rate of interest on the loans and entered into the loans with usurious intent.

140.    The loans are usurious *per se*.

141.    Plaintiffs seek a declaratory judgment that the Loans are void *ab initio* as criminally usurious and, therefore, Defendants are precluded from recovering any remaining

installments due under the loans and must repay all payments made to date and that all documents and collateral be cancelled and surrendered.

WHEREFORE, Plaintiffs seek an order from this Court:

a) Declaring each of the agreements entered into between Plaintiffs and Defendants as a loan transaction, and thus, void *ab initio* because it charges a criminally usurious interest rate in excess of 25%;

b) Vacating all restraining notices, information subpoenas, liens, garnishments, levies, and other enforcement mechanisms in connection with the loans;

c) Ordering Defendants to repay Plaintiffs all interest previously paid by Plaintiffs to Defendants in connection with the criminally usurious loans; and

d) Granting such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
(Injunction)

142.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 141 of this Complaint as if fully set forth herein.

143.    Plaintiffs are entitled to a permanent injunction enjoining Defendants, or any one acting in concert with the Defendants or under its control, from taking any action enforcing the loan agreements, or any related document.

WHEREFORE, Plaintiffs seek an order from this Court:

a) Granting a permanent injunction enjoining Defendants, or any one acting in concert with the Defendants or under its control, from taking any action enforcing the loan agreements, or any related document;

b) Vacating all restraining notices, information subpoenas, liens, garnishments, levies, and other enforcement mechanisms in connection with the agreements; and

c)   Granting such other and further relief as this Court deems just.

### THIRD CAUSE OF ACTION
(Unjust Enrichment/Disgorgement)

144.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 143 of this Complaint as if fully set forth herein.

145.    Each of the agreements entered into between Plaintiffs and Defendants sets forth a collateralized loan transaction to which Massachusetts and New York usury laws are applicable.

146.    The loans charge a criminally usurious interest rate exceeding 25%.

147.    Plaintiffs and Defendants intended to enter into a loan transaction for each of the agreements at issue.

148.    Defendants knowingly charged a criminally usurious rate of interest on the loans and entered into the loans with usurious intent.

149.    The loans are usurious *per se.*

150.    Defendants were unjustly enriched by receiving payment of principle and interest in connection with the criminally usurious loans.

151.    Equity and public policy dictate that Defendants should not be allowed to receive any amounts paid in connection with the criminally usurious loans.

WHEREFORE, Plaintiffs seek an order from this Court:

a)   Declaring the each of the agreements entered into between Plaintiffs and Defendants as a loan transaction, and thus, void *ab initio* because they charge a criminally usurious interest rate in excess of 25%;

b)   Ordering Defendants to repay Plaintiffs all principal and interest previously paid by Plaintiffs to Defendants in connection with the criminally usurious loans; and

c)   Granting such other and further relief as this Court deems just and proper,

including disgorging Defendants of their ill-gotten profits as a result of any and

all similarly issued loans to other victims, and be ordered to pay those ill-gotten

profits into this Court.

### FOURTH CAUSE OF ACTION
(Breach of Contract)

152.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 151 of this Complaint as if fully set forth herein.

153.   Each of the agreements entered into between Plaintiffs and Defendants sets forth a collateralized loan transaction to which Massachusetts and New York usury laws are applicable.

154.   Plaintiffs paid interest in excess of the maximum civil usury rate of 16%.

155.   Each of the agreements provides or similarly provides: "In the event that a court determines that [Defendant] has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate allowed by applicable law and [Defendant] shall promptly refund to Merchant any interest received by [Defendant] in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that [Defendant] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

156.   Plaintiff has paid and Defendants have received interest in excess of the maximum civil usury interest rate of 16% that is allowed under New York law or the maximum criminal usury rate of 20% that is allowed under Massachusetts law.

WHEREFORE, Plaintiffs seek an order from this Court:

34

a) Declaring each of the agreements entered into between Plaintiffs and Defendants as a loan transaction;

b) Ordering Defendants to repay Plaintiffs all interest previously paid by Plaintiffs to Defendants in excess of the maximum usury rate of 16% under the Loans; and

c) Granting such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
(Unconscionability)

157.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 156 of this Complaint as if fully set forth herein.

158.     Each of the agreements entered into between Plaintiffs and Defendants sets forth a collateralized loan transaction to which Massachusetts and New York usury laws are applicable.

159.     Plaintiffs paid interest in excess of the maximum civil usury rate of 16% under New York law or the maximum criminal usury rate of 20% under Massachusetts law.

160.     The terms of the agreements entered into between Plaintiffs and Defendants are unconscionable as a matter of law.

161.     Plaintiff has paid and Defendants have received interest in excess of excess of the maximum civil usury rate of 16% under New York law or the maximum criminal usury rate of 20% under Massachusetts law with respect to the loans.

WHEREFORE, Plaintiffs seek an order from this Court:

a) Declaring each of the agreements entered into between Plaintiffs and Defendants as unconscionable and therefore unenforceable as a matter of law;

b) Ordering Defendants to repay Plaintiffs all interest previously paid by Plaintiffs to Defendants in in excess of the maximum civil usury rate of 16% or maximum criminal rate of 20% under the loans; and

35

c)  Granting such other and further relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION
(N.Y. General Business Law § 349)

162.  Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 161 of this Complaint as if fully set forth herein

163.  Defendants' conduct in inducing Plaintiffs to enter into the loans involved a series of consumer-oriented transactions.

164.  Defendants conspired with and acted in concert with each other to enter into a series of criminally usurious loans with Plaintiffs;

165.  Defendants made material misrepresentations in connection with these transactions by, among other things, mischaracterizing the true nature of the transaction as set forth herein in an intentional and knowing effort to avoid the criminal usury laws.

166.  Defendants' conduct was unlawful.

167.  Defendants willfully and knowingly violated General Business Law § 349.

168.  Plaintiffs suffered damages as a direct result of Defendants' unlawful and deceptive acts.

169.  Defendants are jointly-and-severally liable for all of the damages suffered by Plaintiffs.

WHEREFORE, Plaintiffs seek an order from this Court:

a)  Ordering Defendants to repay Plaintiffs all interest previously paid by Plaintiffs to Defendants in connection with the criminally usurious loans;

b)  Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

c)  Awarding Plaintiffs direct and consequential damages in excess of $1,500,000;

d)   Awarding Plaintiffs treble damages;

e)   Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

f)   Granting such other and further relief as this Court deems just and proper.

### SEVENTH CAUSE OF ACTION
(Mass. Gen. Law ch. 93A)

170.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 169 of this Complaint as if fully set forth herein

171.   Defendants' conduct in inducing Plaintiffs to enter into the loans involved a series of consumer-oriented transactions that substantially occurred within the Commonwealth of Massachusetts.

172.   Defendants violation of Mass. Gen. L. ch. 271, § 49 constitutes a per se violation of Mass. Gen. Law ch. 93A.

173.   Defendants conspired with and acted in concert with each other to violate Mass. Gen. L. ch. 271, § 49.

174.   Defendants made material misrepresentations in connection with these transactions by, among other things, mischaracterizing the true nature of the transaction as set forth herein in an intentional and knowing effort to avoid Massachusetts criminal usury laws.

175.   Defendants' conduct was unfair and unlawful.

176.   Defendants willfully and knowingly violated Mass Gen. Law ch. 93A.

177.   Plaintiffs suffered damages as a direct result of Defendants' unlawful and deceptive acts.

178.   Plaintiffs are jointly-and-severally liable for all of the damages suffered by Plaintiffs.

WHEREFORE, Plaintiffs seek an order from this Court:

a)   Ordering Defendants to repay Plaintiffs all interest previously paid by Plaintiffs to Defendants in connection with the criminally usurious loans;

b)   Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

c)   Awarding Plaintiffs direct and consequential damages in excess of $1,500,000;

d)   Awarding Plaintiffs treble damages;

e)   Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

f)   Granting such other and further relief as this Court deems just and proper.

### EIGHTH CAUSE OF ACTION
(Intentional Interference with Contract and/or Business Relationship)

179.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 178 of this Complaint as if fully set forth herein

180.   Defendants MCA Recovery and Cap Call knew of the business and contractual relationships of Liner Tire through its criminally usurious loan transactions.

181.   Defendants MCA Recovery and Cap Call knowingly and intentionally interfered with theose business relationships and contracts of Liner Tire by unlawfully seizing and freezing its business assets through security interests that were unlawfully obtained through a criminally usurious loan.

182.   Defendant Cap Call attempted to use its unlawful interference with Liner Tire's contractual and business relationships for an improper purpose.   Specifically, Defendant Cap Call attempted to coerce Liner Tire to sign a settlement agreement and release of Cap Call's illegal conduct by improperly seizing one of its credit card vendors.

183.   Defendant MCA Recovery also attempted to use its unlawful interference with Liner Tire's contractual and business relationships for an improper purpose.   Specifically,

Defendant Cap Call attempted to coerce Liner Tire to sign a settlement agreement and release of Cap Call's illegal conduct by improperly seizing one of its credit card vendors.

184.    As a direct, proximate and foreseeable result of these actions, Liner Tire has been unable to satisfy its contractual obligations owed to its customers and other business relationships.

185.    The damage caused by Defendants was intentional and foreseeable.

186.    Plaintiffs suffered damages as a direct result of Defendants' outrageous, unlawful and deceptive acts.

WHEREFORE, Plaintiffs seek an order from this Court:

a)  Ordering Defendants to repay Plaintiffs all interest previously paid by Plaintiffs to Defendants in connection with the criminally usurious loans;

b)  Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

c)  Awarding Plaintiffs direct and consequential damages in excess of $1,500,000;

d)  Awarding Plaintiffs punitive damages;

e)  Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

f)  Granting such other and further relief as this Court deems just and proper.

DATED:     December 5, 2016

                                         **WHITE AND WILLIAMS LLP**

By:_____

                                         Shane R. Heskin
                                         BBO No. 665098
                                         101 Arch Street
                                         Boston, MA 02110
                                         (617) 748-5200 or (215) 864-6329
                                         heskins@whiteandwilliams.com

                                         *Attorneys for Plaintiffs Liner Tire, Inc., Tire*
                                         *Tattoo, Inc., Barry Liner and Michael Liner*

18134855v.1