# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LINER TIRE, INC., TIRE TATTOO, INC.,
BARRY LINER, and MICHAEL LINER,

Plaintiffs,

-against-

Civil Action No.:  16-12468

CAP CALL, LLC; CAPITAL STACK, LLC;
COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d.b.a. PAR FUNDING; ALEX
CHASIN; EVEREST BUSINESS FUNDING,
LLC;  FUNDING METRICS, LLC, d.b.a.
QUICK FIX CAPITAL; IOU FINANCIAL
COMPANY; CURT KRAMER; JASON LEAK;
MANTIS FUNDING, LLC; EVAN
MARMOTT; MERCHANT DISCOUNT
DIRECT, INC.; PEARL CAPITAL REVIS
VENTURES, LLC; POWERUP LENDING
GROUP, LTD; PRINCIPIS CAPITAL, LLC;
RAPID CAPITAL FINANCE, LLC; RICHARD
NAIDICH; RTR RECOVERY, LLC; WIDE
MERCHANT INVESTMENT, INC.; AND
YELLOWSTONE CAPITAL, LLC,

Defendants.

## SECOND AMENDED COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs Liner Tire, Inc., Tire Tattoo, Inc., Barry Liner, (collectively "Liner Tire") and

Michael Liner (collectively "Plaintiffs"), by their attorneys, White and Williams LLP, as and for

their complaint and demand for a trial by jury, allege:

## NATURE OF THE ACTION

1.     This is an action to save a small, family-owned, one-hundred year old local business and its owner from financial ruin.

2.     Liner Tire, which has been servicing the New England area for more than 108 years, has been victimized by a group of predatory lenders that do not appear to be licensed to transact business in Massachusetts.

3.     In total, Defendants took over $1.5 million from Liner Tire based on their predatory loans, which forced Liner Tire's owner, Barry Liner, to drain his life savings and forced his son, Michael Liner, to move back in with his parents at the age of 33.  It also caused Liner Tire to lose one of its long-time employees who it could no longer afford to pay.

4.     Lire Tire was caught in a common tactic used by these predatory lenders, which begins with a criminally usurious starter loan and ends in financial catastrophe.

5.     After inducing the victim to enter into one of these starter loans, a predatory lender will then actively solicit new loans from other lenders to ensure that the victim has sufficient short-term assets to pay off the first criminally usurious loan.  The victim then gets caught in an unsustainable spiral that snowballs until it hits the inevitable wall, draining not only the assets of the business but also the *personal* assets of these small business owners because they are required to personally guarantee the loans due to the unfair bargaining power and desperate nature of these transactions.  They then use these personal threats of financial disaster to exact even more blood from their victims.   That is exactly what happened here.  Unfortunately, because Liner Tire's owner had significant personal assets, this process dragged on much longer than most.

6.     Liner Tire was ultimately warned by his broker of these evils, but it was unfortunately too late because Liner Tire was already caught within the death spiral:

To make matters worse, he's actively shopping your statements and materials around to other ==lenders== trying to either lay off some of ==the loan== he recently made to you on somebody else or find someone to stack on top of him to insure that you get enough cash in the bank so the payments he's debiting from your account won't bounce. I don't know if you were aware of this or perhaps even asked him to do this, but he's pretty much poisoned the well where you're concerned and the good ==lenders== who are/were possible players to get you more money or buy out one or more of your open positions are already aware of his presence and are refusing to get involved.

7.       Once trapped in one of these usurious spirals, it reaches the point where the victim is no longer receiving any additional cash to fund the business, but is rather being forced to enter into one criminal usurious loan after another just to pay off the prior criminally usurious loans.  And that is exactly what happened here:

Advance Amount:   **$176,000.00**

Liner Tire Inc. ("the Merchant"), a Massachusetts Corporation, located at 144 Boylston Street, Brookline, MA Massachusetts 02445 hereby requests and authorizes Capacity Funding LLC ("Capacity") located at 7 Renaissance Square, 5th Floor, White Plains, NY 10601, to allocate the proceeds of this funding, upon the closing of this transaction on this date, as follows:

- **Payoff in the amount of $66,164.00 to Yellowstone Capital for existing obligations pursuant to the payoff letter received.**
- **Payoff in the amount of $47,450.00 to Capacity Deal #2 - Liner Tire for existing obligations pursuant to the payoff letter received.**
- **Payoff in the amount of $56,575.00 to Capacity Deal #3 - Liner Tire for existing obligations pursuant to the payoff letter received.**

**After upfront origination and processing fees of $5,811.00 to Capacity, ==Merchant will net $0.00== which will be wired to Merchant's bank account as provided to Capacity.**

8.       In an effort to disguise the criminally usurious nature of these loans, Defendants use a common instrument that purports on its face to be a "factoring agreement."  But these agreements (which are unconscionable contracts of adhesion) lack all of the elements of a true "factoring agreement" and are nothing more than a collateralized loan.

9.     The criminally usurious nature of these transactions constitutes a per se violation of Mass Gen. Law ch. 93A and the use of these so-called "factoring agreements" demonstrates the intent necessary to treble the damages.

10.     Plaintiffs seek to declare the common instrument used by Defendants for what it is—a criminally usurious loan.

11.     The evidence discovered through the pre-suit investigation is overwhelming, and on information and belief, a review of Defendants' own files, e-mails and cell phones will reveal even more incriminating evidence of this criminal activity.

12.     The evidence obtained to date is also undeniable.   In entering into a nearly identical transaction, one of the Defendants called the transaction exactly what it is:

**LOAN TERMS**

For value received, Borrower hereby promises to pay and deliver to POWER UP the repayment amount (as set forth below and together with any additional charges as set forth herein, collectively, the "Repayment Amount") in lawful money of the United States. The Repayment Amount shall be paid to POWER UP by Borrower's irrevocably authorizing only one depositing account acceptable to POWER UP (the "account") to remit the Specific Daily Repayment Amount specified below (the "Specific Daily Repayment Amount") until such time as POWER UP receives payment in full of the Repayment Amount. Borrower hereby authorizes POWER UP to ACH Debit the specified remittances from the Borrower's bank account on a daily basis and will provide POWER UP with all required access codes.  Borrower understands that it is responsible for ensuring that the Specific Daily Repayment Amount to be debited by POWER UP remains in the account and will be held responsible for any charges incurred by POWER UP resulting from a rejected ACH attempt, not sufficient funds, Bank Default Charge, blocked account or an event of default (Default Charge)(See Appendix A). POWER UP is not responsible for any overdrafts or rejected transactions that may result from POWER UP' ACH debiting the Specific Daily Repayment Amount  under the terms of this agreement. POWER UP will debit the Specific Daily Repayment Amount each business day. POWER UP may, upon Borrower's request, extend the time for any payment due under this Agreement for such time as POWER UP, in its sole discretion, deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between POWER UP and its participants and Borrower, upon the occurrence of an Event of Default under Section 3 of the LOAN AGREEMENT TERMS AND CONDITIONS, the Repayment Amount shall be increased as set forth herein.

Loan Amount: **$170,000.00***    Repayment Amount: **$234,600.00**    Specific Daily Repayment Amount: **$1,396.43**

Additional Documentation and Details:  *Less origination fee and payoffs to IOU,Pearl,Mantis,Ricmond, Yellowstone, Everest,Quickfix; Smart Business

13.     Owing to the rapid repayment rate on a daily basis, the effective interest rate on this admitted loan is, at least, 364%.

14.     Many of the other loan transactions provided by Defendants function exactly the same way, although most were titled differently to disguise their true nature:

## PURCHASE AND SALE OF FUTURE RECEIPTS

Merchant hereby sells, assigns and transfers to POWERUP, as the lead purchaser for itself (making POWERUP on behalf of itself, the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (collectively the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), until such time as the "Receipts Purchased Amount" has been delivered by Merchant to POWERUP. The Receipts Purchased Amount shall be paid to POWERUP by the Merchant irrevocably authorizing only one depositing account acceptable to POWERUP (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's Receipts, until such time as POWERUP receives payment in full of the Receipts Purchased Amount. In consideration of servicing the account, the Merchant hereby authorizes POWERUP to ACH Debit the "Specified Daily Amount" from the merchant's bank account as the base payment credited against the Specified Percentage due. It is the Merchants responsibility to provide bank statements for any and all bank accounts held by the Merchant to reconcile the daily payments made against the Specified Percentage permitting POWERUP to debit or credit the difference to the merchant so that payment equals the Specified Percentage. Failure to provide all of their bank statements in a timely manner or missing a month shall forfeit all rights to future reconciliations. POWERUP may, upon Merchant's request, adjust the amount of any payment due under this Agreement at POWERUP's sole discretion and as it deems appropriate in servicing this Agreement. Merchant understands that it is responsible for ensuring that funds adequate to cover amount to be debited by POWERUP remains in the account. Merchant will be held responsible for any fees incurred by POWERUP resulting from a rejected ACH attempt or an event of default. (See Appendix A) POWERUP is not responsible for any overdrafts or rejected transactions in the Merchants account which may result from POWERUP' scheduled ACH debit under the terms of this agreement.  Notwithstanding anything to the contrary in this Agreement or any other agreement between POWERUP and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this agreement is contained in Appendix A.

| $175,000.00* | 6% | $1,125.00 | $236,250.00 |
|---|---|---|---|
| **Purchase Price** | **Specified Percentage** | **Specified Daily Repayment Amount** | **Receipts Purchased Amount** |

15.   But even when Defendants tried to disguise their true nature, they called Liner

Tire exactly what it was—a "Borrower":

## Factoring Details: Purchase Price (amount you will receive): $150,000.00*

Specified Percentage: ___11%___ Specified Daily Repayment Amount: _____$1,928.57_____

Origination Fee: ___$3,000.00___ Total Receivables Purchased: _____$202,500.00_____

Additional Documentation and Details: *Less origination fee & payoffs Mantis, Wide, Quickfix, Yellowstone & Richmond
Items Needed: latest merchant processing statement
Payoff letters from Mantis, Wide, Quickfix, Yellowstone & Richmond

SEE RIDER ATTACHED HERETO AND MADE A PART HEREOF

## Borrower Information:

Borrower (Business Name): _LINER TIRE, INC._

Guarantor(s): _Barry Liner_

Email Address: _barry@linertire.com_

Phone Number: _617-232-2399_   Location: _Massachusetts_

5

16.     In fact, Liner Tire was specifically told by its broker that these were loans:

Barry,

here are the new loan documents for the $75,000 facility I obtained for you this morning from Everest Business Funding.

Please sign and initial in all places I have flagged and complete the bank log in information on the second to last page. Then fax or email the papers back to me. No notarization or overnight delivery of the original documents is necessary.

Here are the particulars of this loan:

| | |
|---|---|
| Advance Amount: | $75,000 |
| Total Payback: | $108,000 |
| # of Payments: | 90 |
| Daily Payment: | $1,200 |
| Origination Fee: | $395 |
| Payment Processing Fee: | $250 |
| Funding Wire Fee: | $35 |
| Net Amount Funded: | $74,320 |

17.     So did the lenders when soliciting Liner Tire's business:



Hi Barry, please give a call to talk about a new potential loan.

Thank You

Jay Kirshner
111 Great Neck Road, Suite 216
Great Neck, NY 11021
tel. (888) 705-3004
jkirshner@poweruplending.com

18.     Despite these representations to Liner Tire that the true nature of the transaction was a loan, each of the predatory lenders remaining in this lawsuit rely upon their intentional bait-and-switch tactic of trying to characterize these loans as a "factoring agreement" simply to avoid the criminal usury laws of this Commonwealth.

19.   Indeed, one of Liner Tire's lenders admitted that the loans at issue here were exactly that—expensive loans:

Hello Barry,

As per our conversation,  We are happy to have a Premium Approval option for Liner Tire.

This is one of the largest lenders in the industry and they are looking to give you consistent access to capital.

Please review your option and let us know promptly how you would like to proceed.

**$200,000  Approval**
**$276,000  Payback**
**36 % Holdback of Credit Card Sales (Visa, Mastercard and Discover – NO AMEX)**
**Estimated 12 Month term**

This lender would look for you to not have a need to take any more small, short term expensive loans like you have in the past by giving you access to capital consistently!!!

**They offer "Add-On's."**  This is better than most programs because you do not have to wait for more capital and you do not have to refi the loan and pay double interest.

This can also be used for a tax-write off!!

20.   The parties also understood that these were loans in servicing them:

From: Alex Chasin
Sent: Tuesday, November 29, 2016 8:55 AM
To: barry@linertire.com
Subject: Re: balance

Approximately 95k

> On Nov 28, 2016, at 10:40 PM, "barry@linertire.com" <barry@linertire.com> wrote:
>
> Alex: could you get me an approximate balance of my loan with
> yellowstone for accountant thank you barry liner
>
> Barry

21.   As a further demonstration of their unfair and deceptive consumer practices, these predatory lenders include other unconscionable and unfair provisions in their contracts of adhesion to further intimidate their victims from seeking the statutory and constitutional protections of this Commonwealth.   Among other things, Defendants include provisions

requiring their victims to waive (1) the jurisdiction of this Court, (2) their constitutional right to a jury trial, and (3) their right to participate in a class action.  There are also myriad other punitive default provisions that have been declared unlawful by the Supreme Judicial Court of Massachusetts.  Each of these provisions is unenforceable because, among other reasons, they offend the strong public policy of this Commonwealth.

22.     By requiring Liner Tire to execute a confession of judgment within this Commonwealth, through a Massachusetts notary public, Defendants have also violated Mass. Gen. L. ch. 231, 13A, which provides that "any stipulation . . . in a promissory note . . . whereby a party thereto agrees to confess judgment . . . or agrees to authorize another person to confess judgment . . . shall be void."  This is a per se violation of Mass Gen. Law ch. 93A.

23.     Defendant PowerUp's choice of law provision is perhaps the most outrageous of them all, and it is conclusive evidence of its intent to violate Mass Gen. Law ch. 93A. Specifically, PowerUp uses a Virginia choice of law provision because it claims that the Commonwealth of Virginia has no usury proscriptions involving business loans.  PowerUp even went so far as to incorporate in Virginia when it is operated out of Great Neck, New York.

24.     As a matter of law, these unfair and deceptive practices cannot allow these predatory lenders to avoid the criminal laws of this Commonwealth or the laws of the states where many of these predatory lenders reside.  Under both Massachusetts and New York law, courts look to the true nature of the transaction and not the name chosen by the parties.  Here, Liner Tire was in need of a short-term business loan, and Defendants gave Liner Tire exactly that—a short-term business loan.

25.     Because each of these transactions involves a criminally usurious loan, Liner Tire is entitled to a declaration that each loan and its supporting documents are void.  In addition,

Liner Tire is entitled to recover the over $1.5 in criminally usurious interest that has been procured by Liner Tire's lenders, as well as its attorney's fees, and costs of this suit.

26.     In order to deter Defendants from committing these same crimes against future victims within this Commonwealth, Plaintiffs are also entitled to treble damages under 93A, as well as punitive damages for Defendants' tortious conduct.

27.     Liner Tire is also entitled to punitive damages against Defendants Cap Call and RTR Recovery for their outrageous conduct in seizing Liner Tire's assets and then using that seizure as a means to pressure Liner Tire into signing a settlement agreement under duress.

## THE PARTIES

28.     Plaintiff Liner Tire, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal office located at 128 Boylston Street, Brookline, Massachusetts 02445.

29.     Plaintiff Tire Tattoo, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal office located at 128 Boylston Street, Brookline, Massachusetts 02445.

30.     Personal Plaintiff Barry Liner resides at 145 Bridle Trail Road, Needham, Massachusetts 02492.

31.     Personal Plaintiff Michael Liner resides at 145 Bridle Trail Road, Needham, Massachusetts 02492.

32.     Personal Defendant Alex Chasin resides at 50 N. 5th Street, APT 2MW, Brooklyn, NY 11249.

33.     Personal Defendant Curt Kramer resides at 11 Kettlepond Road, Jericho, NY 11753.

34.     Personal Defendant Jason Leak resides at 209 Woodpoint Road, Floor 1, Brooklyn, NY 1211.

35.     Personal Defendant Evan Marmott resides at 2644 211th Street, Bayside, NY 11360.

36.     Personal Defendant Richard Naidich resides at 51 Great Neck Road, Great Neck, NY 11021.

37.     Defendant Cap Call, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business located at 122 East 42nd St., STE 2112, New York, NY 10168.

38.     Defendant Capital Stack, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business located at 11 Broadway, STE 814, New York, NY 10004.

39.     Defendant Complete Business Solutions Group, Inc. d.b.a. Par Funding is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 141 N. 2nd Street, Philadelphia, PA 19106.

40.     Defendant Everest Business Funding, LLC ("EBF Partners") is a limited liability company duly organized and existing under the laws of the State of Florida with its principal place of business located at 2001 NW 107th Ave, 3rd Floor, Miami, Florida 33176.

41.     Defendant Funding Metrics, LLC is a limited liability company duly organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 884 Town Center Drive, Langhorne, PA 19047.

42.     Defendant IOU Financial Company is a corporation duly organized and existing under the laws of the State of Georgia with its principal place of business located at 600 Townpark Lane, Kennesaw, GA 30144.

43.     Defendant Mantis Funding, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business located at 64 Beaver Street, STE 344, New York, NY 10004.

44.     Defendant Merchant Discount Direct, Inc. is a corporation duly organized and existing under the laws of the State of New York with its principal place of business located at 17 State Street, 39th Floor, New York, NY 10004.

45.     Defendant Pearl Capital Revis Ventures, LLC is a limited liability company organized under the laws of the New York with its principal place of business located at 100 Williams Street, 9th Floor, New York, NY 10038-5056.

46.     Defendant PowerUp Lending, LTD is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business located at 111 Great Neck Road, STE 216, Great Neck, NY 11021.

47.     Defendant Principis Capital, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business located at 333 7th Ave, 3rd Floor, New York, NY 10001.

48.     Defendant Rapid Capital Finance, LLC is a limited liability company duly organized and existing under the laws of the State of Florida with its principal place of business located at 11900 Biscayne Blvd., STE 201, Miami, FL 33181.

49.     Defendant RTR Recovery, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business located at 122 East 42nd Street, STE 2112, New York, NY 10168.

50.     Defendant Wide Merchant Investment, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business located at 3850 Wilshire Blvd, STE 160, Los Angeles, CA 90010.

51.     Defendant Yellowstone Capital, LLC is a limited liability company duly organized and existing under the laws of the State of New Jersey with its principal offices located at 1 Evertrust Plaza, Jersey City, NJ 07302.

## JURISDICTION AND VENUE

52.     Each Defendant is subject to the personal jurisdiction of this Court under the Massachusetts Long-Arm Statute, G.L.c. 223A, § 3, because each of the transactions at issue arose from the Defendants' transaction of business within Massachusetts.  Each Defendant is also subject to the personal jurisdiction of this Commonwealth because each directed their tortious conduct within this Commonwealth.

53.     This Court has original jurisdiction over this action because it involves a federal question under 18 U.S.C. § 1962.

54.     This Court also has original jurisdiction over this action based upon 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

55.     This Court has jurisdiction over this declaratory judgment action under 28 U.S.C. § 2201 *et. seq*.

56.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the loans at issue were negotiated, executed, and performed within this judicial district.

57.     Venue is also proper because Plaintiffs regularly conduct business within this judicial district.

58.     This Court has subject matter jurisdiction under Mass. Gen. L. ch. 271, § 49(c), which confers subject matter jurisdiction on Massachusetts courts to declare a criminally usurious loan transaction void.

## FACTUAL BACKGROUND

59.     Liner Tire is engaged in the wholesale and retail sale of automotive tires to customers within the New England area.  It is a family-owned business that has been serving the New England area for more than one-hundred years.

60.     Over the past several years, Liner Tire and the tire industry in general suffered a significant downturn in overall sales.  As a result, Liner Tire experienced a substantial cash shortfall to meet its financial obligations.

61.     In or around early 2014, Liner Tire contacted a broker to assist it with obtaining a short-term business loan to meet those cash flow needs.

62.     Primarily through this broker, Liner Tire entered into the series of loan transactions at issue in this action, which were represented by its broker to be exactly that—loans.

63.     In addition to entering into many of these loans through a broker, Liner Tire was also introduced to some of the other Defendants through references or as the result of an Internet search for providers of short-term business loans.

64.     In entering into these criminally usurious loans, Defendants conspired with each other to enter into the criminally usurious loans.

65.     Among other things, Defendants were aware of Liner Tire's other loans with Defendants through word-of-mouth within the industry.  Defendants were also aware of Liner

Tire's other loans with Defendants as a result of the underwriting process. Defendants were further aware of the other loans with Defendants by monitoring Liner Tire's accounts under the agreements. Defendants also exchanged Liner Tire's financial information among Defendants.

66.    With the exception of the IOU loan, each of these criminally usurious loan transactions had the same or similar material terms and conditions.

67.    Although many of the agreements documenting the transaction asserts that the transaction involved the purchase by Defendants of Liner Tire's accounts receivable, each transaction, when viewed in its totality, is a collateralized loan transaction.

68.    At all relevant times, Liner Tire considered these transactions to be short-term business loans. At no point, did Liner Tire ever seek to sell an interest in its accounts receivable because Liner Tire was concerned that there was a collection risk from any of its customers. Nor did Defendants value the transactions based on the collectability risk of Liner Tire's customers or their ability to pay. Rather, the form of the transactions was dictated solely by Defendants with the intent to disguise the true nature of the transaction.

69.    Defendants entered into these transactions with the intent to charge an interest rate in excess of 25% on a loan transaction.

70.    In connection with these loans, the following documents or similar documents were required to be executed:

    a)    Merchant Agreement or similar purported factoring agreement;

    b)    Security Agreement and Guaranty;

    c)    ACH Authorization Form or Credit Card Holdback Authorization; and

    d)    Affidavit of Confession of Judgment.

71.     Liner Tire was not represented by counsel in connection with any of these transactions, nor was it aware of the criminal usury laws of this Commonwealth.

72.     Under the agreements, no accounts which were purportedly the subject of the sale were listed.  Nor did Defendants ever contact any of Liner Tire's customers to investigate or assess their ability to pay.  There was also no effective transfer of ownership of the accounts receivables to Defendants as a consequence of the sale, and the right of Defendants to collect the receivables only arose if there was a default by Liner Tire in making payments of the daily installments.  Further, there was no provision in the agreements for notification of the account debtors of any assignment of the receivables, and once the daily installments were paid to Defendants, ownership of the receivables remained with Liner Tire.

73.     Nor did Liner Tire understand that there was any risk transfer contemplated under the agreements.  The underwriting of these loans was also not based on any risk assessment of any particular account receivable.

74.     Liner Tire understood at all times that payment of the daily specified amounts was an unconditional requirement of the loan agreements regardless of whether Liner Tire had recovered receivables sufficient to cover that amount.  In fact, that is why Liner Tire was forced to take out additional loans—Liner Tire's receivables were not enough to cover the daily payments so it had to either take out more loans or Barry Liner had to drain his personal life savings in order to meet the daily payment requirements, which he was forced to personally guarantee.

75.     Moreover, Defendants did not actively attempt to collect on any of these alleged receivables directly from Liner Tire's customers.  Instead, they simply took the loan repayment amounts directly from Liner Tire's business accounts without regard as to how those amounts

were generated.  In fact, in order to repay Defendants through daily specified amounts, Liner Tire was required to go out and obtain additional loans that had nothing to do with customer receivables.  These loan funds were taken by Defendants knowing that they were not tied to any customer receivables.

76.     The provision in *some* of Defendants' agreements purporting to allow for a reconciliation based on the actual accounts receivables was unilaterally placed in the agreements solely for the purpose of avoiding the criminal usury laws and was never intended by any party to actually be enforced.  In more than two-and-a-half years, not a single Defendant has ever reconciled its daily specified payments or refunded a repayment to Liner Tire based on this purported reconciliation provision.  Nor has any Defendant ever asked to perform an accounting under that provision to determine the actual customer receivables.  Moreover, Liner Tire was never apprised of this provision, which is in small writing to conceal it from Liner Tire.

77.     Defendants unilaterally inserted this so-called "reconciliation" provision without Liner Tire's knowledge and it was a term that was never negotiated.

78.     Each of the Defendants knew that they were charging a criminally usurious interest rate because the anticipated term of the loan was based on the number of daily specified payments at the time of each transaction.

79.     Plaintiff Barry Liner also understood that these were full recourse loans (despite their title) in which he would be personally responsible to pay in the event that Liner Tire could not pay the daily specified amounts of the loans based on the actual receivables obtained by Liner Tire.

## THE LOAN AGREEMENTS

80.     The number and amount of these criminally usurious loans, and the eagerness and number of these lenders available in the marketplace today—is jaw dropping.

81.    The first criminally usurious loan was entered into on January 28, 2014 with Principis.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables Agreement."  In reality, Principis loaned Liner Tire the sum of at least $150,000 payable in daily equal installments of $765.11 through August 2014, $832.02 through September 2014, $971.91 through October 2014, $776.80 through November 2014, and $711.48 through December 2014.  Liner Tire also paid Principis an additional "Account Setup Fee" of $1,500 in consideration for making the loan.  The interest rate of this loan exceeded 77%.

82.    On March 26, 2014, Liner Tire entered into a criminally usurious loan with Cap Call d.b.a. Capital Stack.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Cap Call loaned Liner Tire the sum of $75,000 payable in 109 equal installments of $995, resulting in an aggregate payment of $108,675.  In addition to charging Liner Tire $33,675 in interest over an approximate six-month period, Liner Tire paid Cap Call an additional "Professional Services Fee" in consideration for making the loan.  The interest rate of this loan exceeded 517%.

83.    On June 24, 2014, Liner Tire entered into a criminally usurious loan with IOU Financial.  Although this loan charged a 15% interest rate on its face, it also contained an origination fee of $3,960 and a Loan Guaranty Fee of $9,056, which constituted fees in consideration for making the loan.  The interest rate of this loan exceeded 50%.

84.    On July 17, 2014, Liner Tire entered into a criminally usurious loan with EBF Partners.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."  In reality, EBF Partners loaned Liner Tire the sum of $50,000 to be repaid in 89 equal installments of $789.77, resulting in an

aggregate payment of $69,500.   In addition to charging Liner Tire $19,500 in interest over an approximate five-month period, Liner Tire paid EBF Partners additional fees in consideration for making the loan.  The interest rate of this loan exceeded 491%.

85.    On September 26, 2014, Liner Tire entered into a criminally usurious loan with Principis.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables Agreement."  In reality, Principis loaned Liner Tire the sum of $71,500 to be repaid in 117 specified daily installments of $806.56, resulting in an aggregate payment of $94,380.  In addition to charging Liner Tire $22,880 in interest over an approximate six-month period, Liner Tire paid Principis $1,072.50 in additional fees in consideration for making the loan.  The effective interest rate of the loan exceeded 223%.

86.    On September 28, 2014, Liner Tire entered into a criminally usurious loan with Pearl Capital.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Pearl Capital loaned Liner Tire the sum of $28,000 to be repaid in 70 equal installments of $580 resulting in an aggregate payment of $40,600.  In addition to charging Liner Tire $12,600 in interest over an approximate five-month period, Liner Tire paid Pearl Capital $800 in additional fees in consideration for making the loan. The interest rate of this loan exceeded 1,434%.

87.    On September 29, 2014, Liner Tire entered into a criminally usurious loan with EBF Partners.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."  In reality, EBF Partners loaned Liner Tire the sum of $55,000 to be repaid in 100 equal installments of $764.50, resulting in an aggregate payment of $76,450.  In addition to charging Liner Tire $21,450 in interest over

a five-month period, Liner Tire paid EBF Partners additional fees in consideration for making the loan. The interest rate of this loan exceeded 458%.

88.     On November 5, 2014, Liner Tire entered into a criminally usurious loan with EBF Partners. The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement." In reality, EBF Partners loaned Liner Tire the sum of $50,000 to be repaid through 30% of Liner Tire's daily credit card receivables resulting in an aggregate payment of $70,000. At the time of this loan transaction, the parties knew that Liner Tire's total credit card receipts averaged over $60,000 per month, which would result in expected monthly payments in excess of $18,000. In addition to charging Liner Tire $20,000 in interest over an intended period of six-months or less, Liner Tire paid EBF Partners an additional "Origination Fee" in consideration for making the loan. Liner Tire's credit card receipts did in fact average over $60,000 per month and the total loan amount was paid off entirely by January 31, 2015. The interest rate of this loan exceeded 672%.

89.     On December 9, 2014, Liner Tire entered into a criminally usurious loan with Pearl Capital. The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement." In reality, Pearl Capital loaned Liner Tire the sum of $60,000 to be repaid in 70 equal installments of $1,243, resulting in an aggregate payment of $87,000. In addition to charging Liner Tire $27,000 in interest over an approximate five-month period, Liner Tire paid Pearl Capital $1,598 in additional fees in consideration for making the loan. The effective interest rate of this loan exceeded 1,435%.

90.     On January 22, 2015, Liner Tire entered into a criminally usurious loan with EBF Partners. The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement." In reality, EBF Partners loaned Liner

Tire the sum of $60,000 to be repaid in 84 equal installments of $1,000, resulting in an aggregate payment of $84,000.   In addition to charging Liner Tire over $24,000 in interest over an approximate four-month period, Liner Tire paid EBF Partners additional fees in consideration for making the loan.  The interest rate of this loan exceeded 731%.

91.     On February 17, 2015, Liner Tire entered into a criminally usurious loan with Pearl Capital.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Pearl Capital loaned Liner Tire the sum of $75,000 to be repaid in 88 equal installments of $1,236, resulting in an aggregate payment of $108,750.  In addition to charging Liner Tire $33,750 in interest over an approximate five-month period, Liner Tire paid Pearl Capital $1,598 in additional fees in consideration for making the loan.   The interest rate of this loan exceeded 680%.

92.     On March 4, 2015, Liner Tire also entered into a criminally usurious loan with Mantis Funding.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Mantis Funding loaned Liner Tire the sum of $35,700 to be repaid in 88 equal installments of $588, resulting in an aggregate payment of $51,765.   In addition to charging Liner Tire $16,015 in interest over an approximate four-month period, Liner Tire paid Mantis Funding additional fees in consideration for making the loan.  The interest rate of this loan exceeded 360%.

93.     On March 18, 2015, Liner Tire entered into a criminally usurious loan with Funding Metrics.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under an "Agreement to Purchase and Sell of Future Receivables."   In reality, Funding Metrics loaned Liner Tire the sum of $50,000 to be repaid in 88 equal installments of $795.45, resulting in an aggregate payment of $70,000.   In addition to charging Liner Tire

$20,000 in interest over an approximate five-month period, Liner Tire paid Funding Metrics an additional "Origination Fee" in consideration for making the loan.  The interest rate of this loan exceeded 520%.

94.    On April 14, 2015, Liner Tire entered into a criminally usurious loan with Yellowstone.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."   In reality, Yellowstone loaned Liner Tire the sum of $50,000 to be repaid through 15% of Liner Tire's credit card receivables in an aggregate payment of $72,500.   At the time of this loan transaction, the parties knew that Liner Tire's total credit card receipts averaged over $60,000 per month, which would result in expected monthly payments in excess of $8,500.   In addition to charging Liner Tire $22,500 in interest over less than an intended nine-month period or less, Liner Tire paid Yellowstone $695 in additional fees in consideration for making the loan.   Liner Tire's credit card receipts did in fact average over $60,000 per month and the total loan amount was paid off entirely by June 22, 2015.  The interest rate of this loan exceeded 220%.

95.    On April 22, 2015, Liner Tire entered into a criminally usurious loan with EBF Partners.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivable under a "Payment Rights Purchase and Sale Agreement."   In reality, EBF Partners loaned Liner Tire the sum of $70,000 to be repaid in 90 equal installments of $1,120, resulting in an aggregate payment of $100,800.  In addition to charging Liner Tire $30,800 in interest over an approximate four-month period, Liner Tire paid EBF Partners additional fees in consideration for making the loan.  The interest rate of this loan exceeded 731%.

96.    On June 22, 2015, Liner Tire entered into a criminally usurious loan with Power Up.  This loan was actually called a loan agreement on its face, which possessed the same

fundamental form of all of the other agreements in this action.   Like the other agreements, PowerUp loaned Liner Tire the sum of $170,000 to be repaid in 168 equal installments of $1,396.43, resulting in an aggregate payment of $234,600.   In addition to charging Liner Tire $64,600 in interest over an eight-month period, Liner Tire paid Power Up an additional "Origination Fee" of $3,395 in consideration for making the loan.   This loan consolidated the prior criminally usurious loans by IOU, Mantis Funding, Richmond Capital, Yellowstone, EBF Partners, Smart Business Funding, QuickFix Capital, and Pearl Capital.   As a result, Liner Tire received a total of $2,345.38 on a loan repayment amount of $234,600.   The interest rate of this loan exceeded 364%.

97.      On August 10, 2015, Liner Tire entered into a criminally usurious loan with EBF Partners.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Payment Rights Purchase and Sale Agreement."   In reality, EBF Partners loaned Liner Tire the sum of $75,000 to be repaid in 90 equal installments of $1,200, resulting in an aggregate payment of $108,000.   In addition to charging Liner Tire $33,000 in interest over an approximate five-month period, Liner Tire paid EBF Partners additional fees in consideration for making the loan.   The interest rate of this loan exceeded 731%.

98.      On September 22, 2015, Liner Tire entered into a criminally usurious loan with Mantis Funding.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Mantis Funding loaned Liner Tire the sum of $40,000 to be repaid in 80 equal installments of $725, resulting in an aggregate payment of $58,000.   In addition to charging Liner Tire $18,000 in interest over an approximate four-month period, Liner Tire paid Mantis Funding additional fees in consideration for making the loan.   The interest rate of this loan exceeded 1,016%.

99.     On September 28, 2015, Liner Tire entered into a criminally usurious loan with Wide Merchant Investment.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."   In reality, Wide Merchant Investment loaned Liner Tire the sum of $12,000 to be repaid in 90 equal installments of $180, resulting in an aggregate payment of $16,200.   In addition to charging Liner Tire $4,000 in interest over an approximate four-month period, Liner Tire paid Wide Merchant Investment an additional "Origination Fee" in consideration for making the loan.   The interest rate of this loan exceeded 460%.

100.    On October 9, 2015, Liner Tire entered into a criminally usurious loan with Funding Metrics.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Funding Metrics loaned Liner Tire the sum of $38,500 to be repaid in 88 equal installments of $570.34, resulting in an aggregate payment of $50,190.   In addition to charging Liner Tire $11,690 in interest over an approximate five-month period, Liner Tire paid Funding Metrics an additional "Origination Fee" in consideration for making the loan.   The interest rate of this loan exceeded 419%.

101.    On January 5, 2016, Liner Tire entered into a criminally usurious loan with Merchant Discount.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."   In reality, Merchant Discount loaned Liner Tire the sum of $50,000 to be repaid in 88 equal installments of $795.45, resulting in an aggregate payment of $70,000.   In addition to charging Liner Tire $20,000 in interest over an approximate five-month period, Liner Tire paid Merchant Discount an additional "Closing Fee" of $795 and a Business Consulting Fee of $2,495 in consideration for making the loan.   The interest rate of this loan exceeded 520%.

102.    On February 16, 2016, Liner Tire entered into a criminally usurious loan with Rapid Capital Finance.  The loan made was similarly disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Rapid Capital Finance loaned Liner Tire the sum of $60,000 to be repaid in 168 equal installments of $500, resulting in an aggregate payment of $84,000.  In addition to charging Liner Tire $24,000 in interest over an approximate eight-month period, Liner Tire paid Rapid Capital Finance other service fees in consideration for making the loan.  The interest rate of this loan exceeded 180%.

103.    On February 16, 2016, Liner Tire entered into a second criminally usurious loan with Rapid Capital Finance.  The loan made was similarly disguised in the form of a purchase of Liner Tire's accounts receivables under a "Receivables Purchase Agreement."  In reality, Rapid Capital Finance loaned Liner Tire the sum of $75,000 payable in exchange for 15% of Liner Tire's daily credit card receipts, resulting in an aggregate payment of $108,000.  At the time of this loan transaction, the parties knew that Liner Tire's total credit card receipts averaged over $60,000 per month, which would result in expected monthly payments in excess of $8,500.  In addition to charging Liner Tire $33,000 in interest over an intended eight-month period, Liner Tire paid Rapid Capital Finance other service fees, including an Administrative/UCC Filing Fee of $1,875 in consideration for making the loan.  Liner Tire's credit card receipts did in fact average over $60,000 per month and the total loan amount was paid off entirely by September 30, 2016.  The interest rate of this loan exceeded 128%.

104.    On March 23, 2016, Liner Tire entered into a criminally usurious loan with Funding Metrics.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Funding Metrics loaned Liner Tire the sum of $50,000 to be repaid in 99 equal installments of $732, resulting in

an aggregate payment of $72,500.  In addition to charging Liner Tire $22,500 in interest over an approximate five-month period, Liner Tire paid Funding Metrics an additional "Origination Fee" in consideration for making the loan.  The interest rate of this loan exceeded 646%.

105.    On March 31, 2016, Liner Tire entered into a criminally usurious loan with Power Up.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement."   In reality, Power Up loaned Liner Tire the sum of $175,000 to be repaid in 210 equal installments of $1,125, resulting in an aggregate payment of $236,250.   In addition to charging Liner Tire $61,250 in interest over an approximate ten-month period, Liner Tire paid Power Up an additional "Origination Fee" in consideration for making the loan.  The interest rate of this loan exceeded 200%.

106.    On May 12, 2016, Liner Tire entered into a criminally usurious loan with Funding Metrics.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Funding Metrics loaned Liner Tire the sum of $54,750 to be repaid in 132 equal installments of $580.68, resulting in an aggregate payment of $76,650.  In addition to charging Liner Tire $22,000 in interest over an approximate seven-month period, Liner Tire paid Funding Metrics an additional "Origination Fee" in consideration for making the loan.  The interest rate of this loan exceeded 269%.

107.    On May 12, 2016, Liner Tire entered into a criminally usurious loan with Wide Merchant Investment.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Wide Merchant Investment loaned Liner Tire the sum of $15,000 to be repaid in 100 equal installments of $217.50, resulting in an aggregate payment of $21,750.  In addition to charging Liner Tire nearly $7,000 in interest over an approximate five-month period, Liner Tire paid Wide Merchant

Investment an additional "Origination Fee" in consideration for making the loan.  The interest rate of this loan exceeded 607%.

108.    On May 18, 2016, Liner Tire entered into a criminally usurious loan transaction with Yellowstone.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Yellowstone loaned Liner Tire the sum of $65,000 to be repaid in 87 equal installments of $1,083, resulting in an aggregate payment of $94,250.  In addition to charging Liner Tire $29,250 in interest over an approximate four-month period, Liner Tire paid Yellowstone a "Professional Services Fee" of $3,250 in consideration for making the loan.  The interest rate of this loan exceeded 738%.

109.    On June 22, 2016, Liner Tire entered into a criminally usurious loan transaction with Yellowstone.  The loan made was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Yellowstone loaned Liner Tire the sum of $65,000 payable in exchange for 20% of Liner Tire's daily credit card receipts, resulting in an aggregate payment of $94,835.  At the time of this loan transaction, the parties knew that Liner Tire's total credit card receipts averaged over $60,000 per month, which would result in expected monthly payments in excess of $12,000.  In addition to charging Liner Tire $29,835 in interest over an intended eight-month period, Liner Tire paid Yellowstone other service fees in consideration for making the loan.  Liner Tire's credit card receipts did in fact average over $60,000 per month and the total loan amount was paid off entirely on or around August 31, 2016.  The interest rate of this loan exceeded 248%.

110.    On August 9, 2016, Liner Tire entered into another criminally usurious loan transaction with Cap Call.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Cap Call loaned Liner Tire the

sum of $50,000 payable in 100 equal installments of $749, resulting in an aggregate payment of $74,950.  In addition to charging Liner Tire $24,950 in interest over an approximate six-month period, Liner Tire paid Cap Call an additional "Professional Services Fee" in consideration for making the loan.  The interest rate of this loan exceeded 750%.

111.    On August 25, 2016, Liner Tire entered into two similar criminally usurious loans with PowerUp.  The first loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement."  In reality, PowerUp loaned Liner Tire the sum of $150,000 to be repaid in 105 equal installments of $1,928.57, resulting in an aggregate payment of $202,500.   In addition to charging Liner Tire more than $52,000 in interest over an approximate five-month period, Liner Tire paid PowerUp an additional "Origination Fee" of $3,000 in consideration for making the loan.  This loan consolidated prior loans by Defendants Mantis, Quickfix, Yellowstone and Richmond.  The interest rate of this loan exceeded 343%.

112.    The second loan made by PowerUp on August 25, 2016 was likewise disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement."  In reality, PowerUp loaned Liner Tire the sum of $125,000 to be repaid in 168 equal installments of $930.06, resulting in an aggregate payment of $156,250.  Power Up charged Liner Tire more than $31,250 in interest over an approximate eight-month period.  The interest rate of this loan exceeded 91%.

113.    On September 8, 2016, Liner Tire entered into a criminally usurious loan transaction with Yellowstone.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Yellowstone loaned Liner Tire the sum of $65,000 to be repaid in 90 equal installments of $1,054, resulting in an aggregate payment of $94,835.  In addition to charging Liner Tire almost $30,000 in interest

over less than an approximate five-month period, Liner Tire paid Yellowstone an additional "Professional Service Fee" of $1,300 in consideration for making the loan.  The interest rate of this loan exceeded 802%.

114.   On September 14, 2016, Liner Tire entered into a criminally usurious loan transaction with PowerUp.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement."  In reality, Power Up loaned Liner Tire the sum of $30,000 to be repaid in equal installments, resulting in an aggregate payment of $43,500.  Power Up charged Liner Tire than $13,500 in interest over an approximate four-month period.  The interest rate of this loan exceeded 400%.

115.   On September 21, 2016, Liner Tire entered into a criminally usurious loan with Cap Call.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Merchant Agreement."  In reality, Cap Call loaned Liner Tire the sum of $100,000 to be repaid in 100 equal installments of $1,499, resulting in an aggregate payment of $149,900.  In addition to charging Liner Tire almost $50,000 in interest over an approximate five-month period, Liner Tire paid Cap Call an additional "Professional Services Fee" in consideration for making the loan.  The interest rate of this loan exceeded 753%.

116.   On September 27, 2016, Liner Tire entered into a criminally usurious loan with Yellowstone.   The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Secured Merchant Agreement."  In reality, Yellowstone loaned Liner Tire the sum of $75,000 to be repaid in 110 equal installments of $994.72, resulting in an aggregate payment of $109,425.  In addition to charging Liner Tire almost $46,000 in interest over an approximate five-month period, Liner Tire paid Yellowstone an additional "ACH Program Fee" in consideration for making the loan.  The interest rate of this loan exceeded 514%.

117.    On September 30, 2016, Liner Tire entered into a criminally usurious loan with Complete Business Solutions.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Factoring Agreement."  In reality, Complete Business Solutions loaned Liner Tire the sum of $115,000 to be repaid through 20% of Liner Tire's receivables in an aggregate payment of $161,000.  At the time of this loan transaction, the parties knew that Liner Tire's total credit card receipts averaged over $60,000 per month, which would result in expected monthly payments in excess of $12,000.  In addition to charging Liner Tire $46,000 in interest over fourteen-month period, Liner Tire paid Complete Business Solutions over $2,000 in other fees in consideration for making the loan.  This loan consolidated a prior criminally usurious loan with Rapid Capital.  The interest rate of this loan exceeded 93%.

118.    On October 21, 2016, Liner Tire entered into a criminally usurious loan with Wide Merchant Investment.  The loan was disguised in the form of a purchase of Liner Tire's accounts receivables under a "Purchase and Sale of Future Receivables."  In reality, Wide Merchant Investment loaned Liner Tire the sum of $15,000 to be repaid in 80 equal installments of $273.75, resulting in an aggregate payment of $21,900.  In addition to charging Liner Tire nearly $7,000 in interest over an approximate four-month period, Liner Tire paid Wide Merchant Investment an additional "Origination Fee" in consideration for making the loan.  The interest rate of this loan exceeded 1,070%.

119.    In total, Liner Tire was charged in excess of a staggering $1.5 million in interest on the face of these loans, which span less than three years.

## DEFENDANTS' EFFORTS TO COLLECT ON AN UNLAWFUL DEBT

120.    In or around September 2016, the inevitable happened.  The specified daily amounts that Defendants electronically debited were rejected due to insufficient funds.  As a

result, Plaintiffs requested that the daily payments be temporarily reduced until the cash receipts improved.

121.     Proving the true nature of these transactions, one of its lenders, ACE Funding, refused to reduce the specified daily amount, responding:  "Not happening, Barry.  Sorry." Instead of adjusting the loan to reflect the actual receipts, ACE Funding attempted to debit more than the specified daily amount creating a negative balance in the Liner Tire accounts.

122.     Between March 2016 and October 2016, ACE Funding received almost $150,000 from Liner Tire on original loan proceeds of $142,000.

123.     Instead of working with Liner Tire to restructure the remaining purely usurious interest payments, ACE Funding filed and obtained a Judgment by Confession on October 28, 2016 for *an additional $100,000*, and then immediately instituted actions to seize the business assets of Liner Tire, which resulted in at least three accounts with Santander Bank being frozen.

124.     This resulted in further ACH debits by Defendants being rejected.

125.     Within days of freezing Liner Tire's accounts, many of the Defendants immediately contacted Liner Tire, and many threatened to take legal and/or enforcement action under the agreements if Liner Tire did not provide an alternative source of funding.

126.     At least one of the Defendants, Cap Call, acted on its threats by seizing one of Liner Tire's credit card vendors, which directly interfered with Liner Tire's ability to conduct its business and pay its other, lenders, vendors and customers.

127.     In fact, when Liner Tire asked Cap Call to release its freeze on Liner Tire's credit card vendor, Cap Call demanded that Liner Tire sign a settlement agreement before it would release those assets.  Cap Call continues to hold Liner Tire's credit card vendor hostage.

**DEFENDANT POWER UP**

128.    In an attempt to enforce its criminally usurious loans, which were merely a consolidation of other known criminally usurious loans, Defendant PowerUp obtained a Judgment by Confession in the State of New York against Liner Tire.   This Judgment was obtained through a Confession of Judgment that was fully executed within this Commonwealth through a Massachusetts notary public.

129.    This instrument is null and void pursuant to Mass. Gen. L. ch. 231, 13A.

130.    Notably, in obtaining this Judgment by Confession, Defendant PowerUp judicially admitted that Liner Tire was a "Borrower" in connection with each of the three loans that were subject to the Judgment by Confession.   This admission was made by and through the advice of legal counsel.

131.    Each of the loans that are subject to the New York Judgment by Confession is void ab initio because they are criminally usurious loans under both Massachusetts and New York law.

132.    Liner Tire does not regularly transact business within the State of New York.

133.    All of Liner Tire's contacts to the PowerUp loans occurred solely within Massachusetts.   Liner Tire is located in Massachusetts.   The loan documents were signed by Liner Tire in Massachusetts.   The loan proceeds were paid to Liner Tire in Massachusetts.   The loan repayments were paid from Liner Tire's bank account located in Massachusetts, and all of Liner Tire's assets secured by the loans are located in Massachusetts.

134.    Accordingly, Liner Tire is not subject to the personal jurisdiction of New York, and the Judgment by Confession is unenforceable.

**RTR RECOVERY AND CAP CALL**

135.    RTR Recovery is a purported collection agency for Cap Call.

31

Among other things, RTR Recovery is used to draft, file and enforce the confessions of judgments used in connection with the criminally usurious loans of Cap Call.

136.    RTR Recovery has conspired with and assisted Cap Call with entering into the criminally usurious loans with Liner Tire, and in its attempt to collect upon an unlawful debt.

137.    RTR Recovery is not a licensed law firm.  Rather, it is a debt recovery agency.

138.    Despite having no license to practice law, RTR Recovery, through its team of lawyers, attempted to seize and did in fact freeze the assets of Liner Tire's Integrity Systems credit card account, on or about November 28, 2016, through the drafting and filing of legal documents.

139.    In doing so, RTR Recovery represented to Integrity Systems that it was writing as General Counsel of RTR Recovery on behalf of Integrity Systems.  The author, however, was an attorney for RTR Recovery, but purported to make legal demands on behalf of Cap Call.

140.    In fact, RTR Recovery admits in its demand letter to Integrity Systems that the sole purpose of the action taken was to coerce a settlement with Liner Tire, stating "I am confident that once the above-requested action is taken by Integrity, in addition to mitigating risk to Integrity with respect to converting the funds in which CCL has a senior secured interest, this matter will hopefully be resolved."

141.    Indeed, the very next day, Cap Call sent Liner Tire a Settlement Agreement and Confession of Judgment in return for unfreezing its credit card account.

142.    RTR Recovery also reiterated that execution of the settlement agreement was a condition of releasing Liner Tire's credit card account:

```
Barry,

I believe Jason Leak had sent you a Settlement Agreement and COJ to
execute yesterday. Since I have not received these documents back, my
client will not give me the "green light" to give Gina a response.
Please execute and return these documents to me, or Jason, as soon as
possible.

Thank you.
Sincerely,


Tara N. Pomparelli, Esq.

General Counsel

RTR Recovery, LLC
```

143.   On information and belief, RTR Recovery drafted these legal documents for Cap Call to use in connection with its unfair and deceptive attempt to collect an unlawful debt.

144.   Cap Call, through the legal advice of RTR Recovery, used this legal advice in an attempt to coerce Liner Tire into signing a legal agreement that would have turned a criminally usurious loan into a legally binding settlement agreement.

145.   On information and belief, this provision of legal advice violated N.Y. C.L.S. Jud. Law § 478.

146.   Liner Tire has been directly damaged as a result of RTR Recovery's unlawful, unfair and deceptive actions within the Commonwealth of Massachusetts.

## <u>YELLOWSTONE</u>

147.   Yellowstone's conduct is perhaps the most pervasive in the industry.

148.   According to one of its owners, Yellowstone makes $500 million in these types of loans—every month.  If true, Yellowstone issues $6 billion dollars a year in these types of loans.

149.   Yellowstone unfairly exerts its financial might to threaten and intimidate its financially weakened victims into capitulating to its unlawful demands.  In this case alone, Yellowstone brandished its financial superiority by taunting Liner Tire, a local Boston company,

when it had the temerity to obtain the assistance of counsel:  "We put out $500M per month, do you think you have the war chest to keep up with us in court?  Come on man"

150.    On information and belief, this was a knowingly false statement made with the intent to threaten and intimidate Liner Tire into paying an unlawful debt.

151.    A search of the New York E-Court system reveals 29 actions brought by Yellowstone against other potential victims of its predatory loans.

## DAMAGES

152.    Due to Liner Tire's financial condition, Liner Tire has already had to reduce the pay of long-time employees who have threatened to leave, and did in fact, leave Liner Tire.

153.    Barry Liner has personally stopped taking a salary due to the financial condition of Liner Tire, and so has his son, Michael Liner.

154.    As a direct, proximate and foreseeable cause of Defendants' unlawful actions, Michael Liner has been forced to sell his residential home and pay Liner Tire's vendors out of his own pocket.  He is now forced to live with his parents at the age of 33.

155.    As a direct, proximate and foreseeable cause of Defendants' unlawful actions, Barry Liner has also had to borrow substantial sums from other family members in order keep Liner Tire afloat and to keep up with his own personal finances.

156.    As a direct, proximate and foreseeable cause of Defendants' unlawful actions, Barry Liner was also forced to liquidate his retirement funds and prematurely pay income taxes on amounts he was required to use to keep his third generation business afloat.

157.    As a direct, proximate and foreseeable cause of Defendants' unlawful actions, Barry Liner and Michael Liner have suffered mental anguish and severe emotional distress.

158.    As a result of Defendants' criminal conduct, Barry Liner has also personally suffered damages by having to provide loans to Liner Tire from his personal and retirement

assets.  Among other things, Barry Liner has had to pay taxes, interest and penalties as a result of these personal loans.

159.    Barry Liner has also suffered losses on those loans because Liner Tire is currently unable to payback those loans.

160.    Liner Tire has also suffered direct damages by loss of goodwill, personnel and business opportunities.  Liner Tire has also suffered direct damages from the devaluation of its business.

**FIRST CAUSE OF ACTION**
(Fraud and Fraud in the Inducement)

161.    Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162.    Defendants fraudulently induced Liner Tire to enter into the transactions by misrepresenting their true nature.

163.    At all relevant times, Liner Tire sought a loan and believed it was getting a loan.

164.    Defendants actively solicited the transactions from Liner Tire by affirmatively representing that they were providing in substance, or, in fact, a loan.

165.    Liner Tire's broker who negotiated most of the transactions at issue also represented to Liner Tire that it was receiving a loan from Defendants.

166.    In addition, Defendants (with the exception of IOU) falsely represented the market value of the future receivables that Defendants falsely purported to purchase.  This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Defendants in order to disguise the true nature of the transaction.

167.    Defendants further knowingly misrepresented the nature of the fees charged in connection with the loans.  Defendants knowingly misrepresented that the fees were reasonable costs of servicing the loans when, in fact, they were merely additional interest charged by Defendants in consideration of making the loans.

168.    At the time these representations were made, Defendants knew the representations were false.

169.    Defendants made these representations with the intent to deceive Liner Tire, and with the intent to avoid the criminal usury laws.

170.    Liner Tire reasonably relied upon these knowingly false representations to its detriment.

171.    As a direct and proximate cause of these knowingly false representations, Liner Tire has been damaged, and Defendants are jointly and severally liable for their tortious conduct.

WHEREFORE, Liner Tire seeks an order from this Court:

a)   Ordering Defendants to repay Liner Tire all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

b)   Granting an injunction restraining Defendants from enforcing any of their rights under the criminally usurious loans;

c)   Awarding Liner Tire direct and consequential damages in excess of $1,500,000, as well as prejudgment interest;

d)   Awarding Liner Tire punitive damages;

e)   Awarding Liner Tire its costs incurred in this action; and

f)   Granting such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
(Mass. Gen. Law ch. 93A)

172.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 171 of this Complaint as if fully set forth herein.

173.    Defendants' conduct in inducing Liner Tire to enter into the loans involved a series of consumer-oriented transactions that substantially occurred within the Commonwealth of Massachusetts.

174.    Defendants violation of Mass. Gen. L. ch. 271, § 49 and Mass. Gen. L. ch. 231, 13A constitute per se violations of Mass. Gen. Law ch. 93A §§ 2, 9, and 11.

175.    Defendants conspired with and acted in concert with each other to violate Mass. Gen. L. ch. 271, § 49 and Mass. Gen. L. ch. 231, 13A.

176.    Defendants made material misrepresentations in connection with these transactions by, among other things, mischaracterizing the true nature of the transaction as set forth herein in an intentional and knowing effort to avoid Massachusetts' criminal usury laws.

177.    Defendants also violated Mass Gen. Law ch. 93A §§ 2, 9, and 11 by including unconscionable and unfair provisions in connection with the loan agreements, which were contracts of adhesion.  Among these unconscionable and unfair provisions, Defendants (with the exception of IOU) required Liner Tire to:

    a)  Waive the right to a jury trial;

    b)  Pay Defendants their attorney's fees at a punitive rate that was not measured by the quantum meruit of fees earned but on the value of the amount in default;

    c)  Waive the right to participate in a class action;

    d)  Waive the right to seek legal redress in their home state;

e) Waive the right to contest the forum of any other jurisdiction Defendants unilaterally select;

f) Execute a Confession of Judgment for the full amount of debt in violation of Massachusetts law;

g) Execute a Power of Attorney;

h) Execute a Security Agreement giving Defendants a UCC lien on all of its assets;

i) Execute a personal guarantee making the individual owner of the business personally liable for any default under the agreement;

j) Indemnify Defendants against third-party claims;

k) Waive claims for direct, consequential and punitive damages; and

l) Consent to crippling default penalties and enforcement actions.

178.   Defendants' conduct was willful, unfair and unlawful.

179.   Defendants willfully and knowingly violated Mass Gen. Law ch. 93A.

180.   Plaintiffs suffered damages as a direct result of Defendants' unlawful and deceptive acts.

181.   Defendants are jointly-and-severally liable for all of the damages suffered by Plaintiffs.

WHEREFORE, Plaintiffs seek an order from this Court:

a) Ordering Defendants to repay Liner Tire all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

b) Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

   c)   Awarding Plaintiffs direct and consequential damages in excess of $1,500,000, including prejudgment interest;

   d)   Awarding Plaintiffs treble damages;

   e)   Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

   f)   Granting such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
(Declaratory Judgment/Criminal Usury/Personal Jurisdiction)

182.   Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 181 of this Complaint as if fully set forth herein.

183.   Each of the agreements entered into between Liner Tire and Defendants sets forth a collateralized loan transaction to which Massachusetts and/or New York usury laws are applicable.

184.   Each of the loans charges a criminally usurious interest rate in excess of 25%.

185.   Liner Tire and Defendants intended to enter into a loan transaction for each of the agreements at issue.

186.   Defendants knowingly charged a criminally usurious rate of interest in excess of 25% on the loans and entered into the loans with usurious intent.

187.   The loans are usurious *per se*.

188.   Liner Tire seeks a declaratory judgment that the loans are void *ab initio* as criminally usurious and, therefore, Defendants are precluded from recovering any remaining installments due under the loans and must repay all payments made to date and that all documents and collateral be cancelled and surrendered.

189.    The Confessions of Judgment that Liner Tire was forced to execute in connection with each of the loans were all executed within this Commonwealth through a Massachusetts notary public.

190.    Each of these Confessions of Judgment is thus null and void under Mass. Gen. L. ch. 231, 13A.

191.    Liner Tire does not transact business in the State of New York.

192.    Accordingly, Liner Tire is not subject to the personal jurisdiction of the State of New York.

193.    Any Judgment by Confession obtained by any of the Defendants within the State of New York is therefore unenforceable against Liner Tire.

WHEREFORE, Liner Tire seeks an order from this Court declaring that:

a)  Each of the agreements entered into between Liner Tire and Defendants as a loan transaction, and thus, void *ab initio* because it charges a criminally usurious interest rate in excess of 25%;

b)  All restraining notices, liens, garnishments, levies, and other enforcement mechanisms in connection with the loans are vacated;

c)  Defendants must repay Liner Tire all principal and interest previously paid by Liner Tire to Defendants in connection with the criminally usurious loans, including prejudgment interest;

d)  Any Judgment by Confession obtained by Defendants, including the Judgment by Confession obtained by Defendant PowerUp, is unenforceable against Liner Tire on the basis of lack of personal jurisdiction; and

e) Plaintiffs are entitled to any other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### (Injunction)

194.    Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 193 of this Complaint as if fully set forth herein.

195.    Liner Tire is entitled to a permanent injunction enjoining Defendants, or any one acting in concert with the Defendants or under its control, from taking any action enforcing the criminally usurious loan agreements, or any related document.

WHEREFORE, Liner Tire seeks an order from this Court:

a) Granting a permanent injunction enjoining Defendants, or any one acting in concert with the Defendants or under its control, from taking any action enforcing the loan agreements, or any related document;

b) Vacating all restraining notices, information subpoenas, liens, garnishments, levies, and other enforcement mechanisms in connection with the agreements; and

c) Granting such other and further relief as this Court deems just.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment/Disgorgement)

196.    Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 195 of this Complaint as if fully set forth herein.

197.    Each of the agreements entered into between Liner Tire and Defendants sets forth a collateralized loan transaction to which Massachusetts and/or New York usury laws are applicable.

198.    The loans charge a criminally usurious interest rate exceeding 25%.

199.    Defendants knowingly charged a criminally usurious rate of interest in excess of 25% on the loans and entered into the loans with usurious intent.

200.    The principal purportedly received on many of the loans was used to pay off other criminally usurious loans by Defendants, which were known to Defendants at the time of the transactions.

201.    Equity and public policy dictate that Defendants should not be allowed to receive any amounts paid in connection with the criminally usurious loans.

WHEREFORE, Liner Tire seeks an order from this Court:

a)  Declaring the each of the agreements entered into between Liner Tire and Defendants as a loan transaction, and thus, void *ab initio* because they charge a criminally usurious interest rate in excess of 25%;

b)  Ordering Defendants to repay Liner Tire all principal and interest previously paid to Defendants in connection with the criminally usurious loans, including prejudgment interest; and

c)  Granting such other and further relief as this Court deems just and proper, including disgorging Defendants of their ill-gotten profits.

## SIXTH CAUSE OF ACTION
(Plead in the alternative, Breach of Contract)

202.    Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 201 of this Complaint as if fully set forth herein.

203.    Each of the agreements entered into between Liner Tire and Defendants sets forth a collateralized loan transaction to which Massachusetts and/or New York usury laws are applicable.

204.     With the exception of the IOU, Capacity and EBF loans, each of the agreements provides or similarly provides: "In the event that a court determines that [Defendant] has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate allowed by applicable law and [Defendant] shall promptly refund to Merchant any interest received by [Defendant] in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that [Defendant] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

205.     Liner Tire has paid and Defendants have received interest in excess of the maximum civil usury interest rate of 16% that is allowed under New York law or the maximum criminal usury rate of 20% that is allowed under Massachusetts law.

WHEREFORE, Liner Tire seeks an order from this Court:

a)  Declaring each of the agreements entered into between Liner Tire and Defendants as a loan transaction; and

b)  Granting such other and further relief as this Court deems just and proper.

**<u>SEVENTH CAUSE OF ACTION</u>**
(Unconscionability)

206.     Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 205 of this Complaint as if fully set forth herein.

207.     Each of the agreements entered into between Liner Tire and Defendants sets forth a collateralized loan transaction to which Massachusetts and/or New York usury laws are applicable.

208.     Liner Tire paid interest in excess of the maximum civil usury rate of 16% under New York law or the maximum criminal usury rate of 20% under Massachusetts law.

209.     The terms of the agreements entered into between Liner Tire and Defendants are unconscionable as a matter of law.

210.     Liner Tire has paid and Defendants have received interest in excess of excess of the maximum civil usury rate of 16% under New York law or the maximum criminal usury rate of 20% under Massachusetts law with respect to the loans.

WHEREFORE, Liner Tire seeks an order from this Court:

a)   Declaring each of the agreements entered into between Liner Tire and Defendants as unconscionable and therefore unenforceable as a matter of law;

b)   Ordering Defendants to repay Liner Tire all interest previously paid to Defendants in in excess of the maximum civil usury rate of 16% or maximum criminal rate of 20% under the loans, including prejudgment interest; and

c)   Granting such other and further relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION
(Pled in the alternative, N.Y. General Business Law § 349, as to all New York Defendants)

211.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs 1 through 210 of this Complaint as if fully set forth herein

212.     Defendants' conduct in inducing Liner Tire to enter into the loans involved a series of consumer-oriented transactions by, among other things, involving the personal assets of an individual through Defendants' procurement of a personal guarantee from Barry Liner.   In requiring this personal guarantee, Defendants knew its conduct would impact the public, including the personal and household assets of an individual.

213.     The unlawful conduct of Defendants also proximately caused damages to other individuals who were foreseeably impacted by Defendants' unlawful conduct, such as the employees of Liner Tire and the family members of Barry Liner.

214.    Defendants conspired with and acted in concert with each other to enter into a series of criminally usurious loans with Liner Tire;

215.    Defendants made material misrepresentations in connection with these transactions by, among other things, mischaracterizing the true nature of the transaction as set forth herein in an intentional and knowing effort to avoid the criminal usury laws.

216.    Defendants' conduct was unlawful.

217.    Defendants willfully and knowingly violated General Business Law § 349.

218.    Plaintiffs suffered damages as a direct result of Defendants' unlawful and deceptive acts.

219.    Defendants are jointly-and-severally liable for all of the damages suffered by Plaintiffs.

WHEREFORE, Plaintiffs seek an order from this Court:

a)   Ordering Defendants to repay Liner Tire all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

b)   Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

c)   Awarding Plaintiffs direct and consequential damages in excess of $1,500,000, including prejudgment interest;

d)   Awarding Plaintiffs multiple damages;

e)   Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

f)   Granting such other and further relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION
(Intentional Interference with Contract and/or Business Relationship)

220.    Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 219 of this Complaint as if fully set forth herein

221.    Defendants RTR Recovery and Cap Call knew of the business and contractual relationships of Liner Tire through its criminally usurious loan transactions.

222.    Defendants RTR Recovery and Cap Call knowingly and intentionally interfered with those business relationships and contracts of Liner Tire by unlawfully seizing and freezing its business assets through security interests that were unlawfully obtained through a criminally usurious loan.

223.    Defendants RTR Recovery and Cap Call attempted to use its unlawful interference with Liner Tire's contractual and business relationships for an improper purpose. Specifically, Defendant Cap Call attempted to coerce Liner Tire to sign a settlement agreement and release of Cap Call's illegal conduct by improperly seizing one of its credit card vendors.

224.    As a direct, proximate and foreseeable result of these actions, Liner Tire has been unable to satisfy its contractual obligations owed to its customers and other business relationships.

225.    The damage caused by Defendants was intentional and foreseeable.

226.    Liner Tire suffered damages as a direct result of Defendants' outrageous, unlawful and deceptive acts.

WHEREFORE, Liner Tire seeks an order from this Court:

a) Ordering Defendants Cap Call and RTR Recovery to repay Liner Tire all interest previously paid to Defendants in connection with the criminally usurious loans;

b) Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

c) Awarding Liner Tire direct and consequential damages in excess of $1,500,000;

d) Awarding Liner Tire punitive damages;

e) Awarding Liner Tire their attorney's fees and costs incurred in this action; and

f) Granting such other and further relief as this Court deems just and proper.

## TENTH CAUSE OF ACTION
(Plead in the alternative, Reformation)

227. Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 226 of this Complaint as if fully set forth herein.

228. Each of the agreements entered into between Liner Tire and Defendants sets forth a collateralized loan transaction to which Massachusetts and/or New York usury laws are applicable.

229. Liner Tire has paid and Defendants have received interest in excess of the maximum civil usury interest rate of 16% that is allowed under New York law or the maximum criminal usury rate of 20% that is allowed under Massachusetts law.

230. Liner Tire is therefore entitled to reform the loans under Mass. Gen. L. ch. 271, § 49 in order to recover any amounts that were paid by Liner Tire and received by Defendants in excess of these maximum usury amounts or in excess of prevailing market interest rates.

WHEREFORE, Liner Tire seeks an order from this Court:

a) Declaring each of the agreements entered into between Liner Tire and Defendants as a loan transaction;

b) Reforming the loan transactions to an equitable interest rate not to exceed the applicable civil or criminal usury laws;

c) Ordering Defendants to repay Liner Tire all interest previously paid by Liner Tire to Defendants in excess of the equitable interest rate determined by the Court but not to exceed the applicable civil or criminal usury rates; and

d) Granting such other and further relief as this Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
(18 U.S.C. §§ 1962(b), 1964 Racketeer Influenced and Corrupt Organizations Act, as to all Corporate Defendants except Complete Business Solutions and IOU)

231.    Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 230 of this Complaint as if fully set forth herein.

232.    Defendants are predatory lenders that are in business for the primary purpose of providing criminally usurious loans to individuals and/or businesses that are in desperate need of cash.

233.    Each of the Defendants routinely and systematically committed crimes in violation of Mass. Gen. L. ch. 271, § 49 and/or N.Y. Penal Law § 190.40 over the course of at least a two-year period.

234.    Defendants are engaged in an enterprise that provides criminally usurious loans through interstate commerce.  In committing these crimes, Defendants used electronic wires and electronic mail to perpetuate their crimes in violation of 18 U.S.C. § 1343.

235.    Each of the loan documents was transmitted through interstate commerce by electronic mail on or around the dates of each applicable transaction as specifically stated herein. These loan documents contained knowingly false statements that were made with the intent to

deceive and defraud Liner Tire as stated in Count I herein. These statements were made in furtherance of the crimes stated herein.

236. Each of the loan transactions was funded and repaid through interstate commerce by electronic wire. These electronic wires were made for the express purpose of defrauding Liner Tire out of money as stated in Count I herein. Defendants knew that the loan transactions were illegal and charged an interest rate of at least twice the applicable criminal usury rate under Massachusetts and/or New York penal law.

237. Defendants are also engaged in an enterprise that attempts to collect upon these unlawful debts by among, other things, collecting and using collateral and/or illegal instruments to secure these criminally usurious loans.

238. Each Defendant has actively participated in these criminal enterprises.

239. Each Defendant committed at least two predicate acts either directly through Liner Tire or in connection with other victims of their predatory lending.

240. Liner Tire suffered damages as a direct result of Defendants' unlawful and deceptive acts.

241. Defendants are jointly-and-severally liable for all of the damages suffered by Liner Tire.

WHEREFORE, Liner Tire seeks an order from this Court:

a) Ordering Defendants to repay Liner Tire all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

b) Granting an injunction restraining Defendants from enforcing any of their rights under the criminally usurious loans;

c)  Awarding Liner Tire direct and consequential damages in excess of $1,500,000, as well as prejudgment interest;

d)  Awarding Liner Tire treble damages;

e)  Awarding Liner Tire its attorney's fees and costs incurred in this action; and

f)  Granting such other and further relief as this Court deems just and proper.

## TWELFTH CAUSE OF ACTION
(18 U.S.C. §§ 1962(a),(b),(c), 1964, Racketeer Influenced and Corrupt Organizations
Act, as to all Personal Defendants except Complete Business Solutions and IOU)

242.  Liner Tire repeats and re-alleges the allegations of each of the foregoing paragraphs 1 through 230 of this Complaint as if fully set forth herein.

243.  Personal Defendants Richard Naidich and Curt Kramer are direct and/or indirect principal investors of Defendant PowerUp.

244.  Personal Defendant Alex Chacin is a direct principal investor of Defendant Yellowstone.

245.  Personal Defendants Jason Leak and Evan Marmott are direct and/or indirect principal investors of Defendant Cap Call.

246.  Each of the Personal Defendants actively or indirectly invested and/or derived income from a pattern of racketeering activity as stated herein.

247.  Each of the Personal Defendants actively or indirectly invested and/or derived income through the collection of the unlawful debts stated herein.

248.  Each of the Personal Defendants has actively participated in an enterprise that provides criminally usurious loans through interstate commerce.  In committing these crimes, Personal Defendants used electronic wires and electronic mail to perpetuate their crimes in violation of 18 U.S.C. § 1343.

249.     Each of the loan documents was transmitted through interstate commerce by electronic mail on or around the dates of each applicable transaction as specifically stated herein. These loan documents contained knowingly false statements that were made with the intent to deceive and defraud Liner Tire as stated in Count I herein.   These statements were made in furtherance of the crimes stated herein.

250.     Each of the loan transactions was funded and repaid through interstate commerce by electronic wire.   These electronic wires were made for the express purpose of defrauding Liner Tire out of money as stated in Count I herein.   Defendants knew that the loan transactions were illegal and charged an interest rate of at least twice the applicable criminal usury rate under Massachusetts and/or New York penal law.

251.     Personal Defendants are also engaged in an enterprise that attempts to collect upon these unlawful debts by among, other things, collecting and using collateral and/or illegal instruments to secure these criminally usurious loans.

252.     Each Personal Defendant has committed at least two predicate acts either directly through Liner Tire or in connection with other victims of their predatory lending.

253.     Liner Tire suffered damages as a direct result of Personal Defendants' unlawful and deceptive acts.

254.     Personal Defendants are jointly-and-severally liable for all of the damages suffered by Liner Tire.

WHEREFORE, Liner Tire seeks an order from this Court:

g)  Ordering Defendants to repay Liner Tire all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

h)  Granting an injunction restraining Defendants from enforcing any of their rights under the criminally usurious loans;

i)  Awarding Liner Tire direct and consequential damages in excess of $1,500,000, as well as prejudgment interest;

j)  Awarding Liner Tire treble damages;

k)  Awarding Liner Tire its attorney's fees and costs incurred in this action; and

l)  Granting such other and further relief as this Court deems just and proper.

Dated: January 13, 2016

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
BBO No. 665098
101 Arch Street
Boston, MA 02110
(617) 748-5200 or (215) 864-6329
heskins@whiteandwilliams.com

*Attorneys for Plaintiffs Liner Tire, Inc., Tire Tattoo, Inc., Barry Liner and Michael Liner*

18279294v.1